**UNITED STATES of America, Appellee,**

**v.**

**Feng LI, aka Li Feng; Zhao Hui, aka Hui Zhao, Defendants,**

**Ru Jie Lu, aka Ru Lu Jie, Defendant–Appellant.**

**No. 1184, Docket 96–1508.**

United States Court of Appeals, Second Circuit.

Argued March 20, 1997.

Decided May 27, 1997.

126

Larry H. Krantz, New York City, for Defendant–Appellant.

Treby McL. Williams, Assistant United States Attorney (Mary Jo White, United States Attorney for the Southern District of New York, Peter G. Neiman and Guy Petrillo, Assistant United States Attorneys, of counsel), for Appellee.

Before: FEINBERG and PARKER, Circuit Judges and SHADUR *, District Judge.

SHADUR, Senior District Judge:

Ru Jie Lu ("Lu") appeals from a judgment of conviction entered July 29, 1996 in the United States District Court for the South-

* Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

ern District of New York. Following a four-day jury trial Lu was found guilty of unauthorized acquisition of food stamps (7 U.S.C. § 2024(b)), bank fraud (18 U.S.C. § 1344) and unlawful disposal of food stamps (18 U.S.C. § 641). Additionally the jury found that moneys obtained by Lu as a result of the bank fraud were subject to criminal forfeiture (18 U.S.C. §§ 982(a)(2) and 982(b)(1)(B)). Lu received a sentence of 42 months imprisonment to be followed by four years of supervised release, was charged with a $150 special assessment and was ordered to make restitution in the amount of $100,000. Lu claims that the district court (1) committed plain error in trial evidentiary rulings; (2) did not properly comply at her sentencing with Fed.R.Crim.P. ("Rule") 32(c)(3)(C), which required the court to afford Lu an opportunity to speak prior to imposing sentence; and (3) abused its discretion when, after Lu asserted her innocence during sentencing allocution, the court imposed a harsher sentence than it had originally indicated. We affirm Lu's conviction, but we vacate her sentence and remand for resentencing.

### Background

Lu, a 60–year–old immigrant from the People's Republic of China, was arrested in September 1994 in connection with a government investigation into food stamp fraud. She was charged and tried under a five-count indictment, with each charge arising out of an illegal food stamp redemption scheme in which Lu would purchase food stamps for 96% of their face value and deposit those stamps at a local bank. Count One charged Lu with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Count Two charged her with unauthorized acquisition of food stamps in violation of 7 U.S.C. § 2024(b). Count Three charged her with bank fraud in violation of 18 U.S.C. § 1344.

Count Four charged her with unlawful disposal of food stamps in violation of 18 U.S.C. § 1344. Finally, Count Five sought forfeiture of funds illegally obtained by Lu pursuant to 18 U.S.C. §§ 982(a)(2) and 982(b)(1)(B).

Trial began on May 15, 1995 and concluded on May 18 when the jury returned a guilty verdict on four counts.[1] Lu was sentenced on July 22, 1996.[2]

At trial Lu did not dispute that she had deposited over $3 million dollars in food stamps into bank accounts held by Shanghai Trading, Inc. ("Shanghai"), an Elmhurst, Queens grocery in which she was an officer. Instead her sole defense to each charge was that she was unaware that it was unlawful to purchase and redeem food stamps. That was an appropriate trial strategy, for as the district court instructed the jury, Lu's guilty knowledge was a prerequisite for conviction on each of the charged offenses:

> In most situations, the defendant does not have to be aware of the requirements of the law because you know the old maxim about the ignorance of the law is no excuse. This charge is somewhat different. The defendant does not have to know she was violating a particular statute, and this is still true.

> However, she must have known that the exchange of food stamps for cash was a violation of the law and violation of the Department of Agriculture regulations. In this case, unlike many cases in which the defendant is not required to know that the conduct is specifically unlawful, in this particular case she must have acted with the specific knowledge that what she was doing violated the food stamp statutes. You should understand that, and that knowledge has to be proven beyond a reasonable doubt.

---

**1.** Before the case was submitted to the jury, the district judge granted Lu's Rule 29(a) motion for judgment of acquittal as to Count One.

**2.** That extended delay was occasioned by a post-conviction psychiatric examination of Lu, which disclosed her to be suffering from a deep depression. Further psychiatric evaluation then took place at Carswell FCI, and the government psy-

chologists' ultimate conclusion that Lu was competent for sentencing (though they opined that she suffered from a "personality disorder" and an "adjustment dis order with depressed mood," so that she "may become emotional, experience periodic crying spells and mild depressive symptoms") was accepted by the district court.

Lu neither testified in her own defense nor offered any evidence at trial. Hence the following facts were developed upon examination of the government's witnesses.

Shanghai applied for a food stamp redemption license from the United States Department of Agriculture ("Department") in September 1992. That application stated Shanghai's address, detailed its store hours and estimated that it would have annual food sales of approximately $50,000. It named Lu's daughter Hui Zhao ("Zhao") as owner of the store, and Zhao signed this certification on the application:

> I accept responsibility on behalf of the firm to prevent violations of the Food Stamp Program regulations, such as, but not limited to: trading cash for food stamps . . . .

On October 6, 1992 Zhao attended a food stamp orientation class, which included instruction regarding the illegality of trafficking in food stamps and purchasing food stamps at a discount. Shanghai was issued a food stamp redemption license on November 16.

Zhao opened Shanghai in September 1992, but about three months later she decided to cease operations as a result of business losses. In about November 1992 Lu and three partners took over operation of the store. It was at that point that Lu first met Yi Chen ("Chen"), who Zhao indicated had previously supplied food stamps for cash.

In November 1992 Lu and Chen agreed to this series of transactions for Lu's repeated purchase of food stamps: Chen would deliver food stamps directly to Lu at her apartment; Lu would use Shanghai's food stamp license to redeem the stamps for cash; Lu would return 96% of the face value of the stamps upon Chen's next delivery, keeping the remaining 4%. Ordinarily Chen would deliver food stamps in $10,000 increments, which allowed Lu to keep $300 for herself after paying the bank a $100 processing fee. From November 1992 to September 1994 Lu redeemed approximately $3.5 million worth of food stamps for Shanghai, despite very few actual food sales. Indeed, Lu continued to redeem large volumes of food stamps for months after Shanghai's store closed in March 1994.

After being arrested in September 1994, Lu signed a waiver of rights form that had been translated into Chinese. She was then questioned, through a Chinese interpreter, for three to four hours by Special Agents of the Federal Bureau of Investigations and an Assistant United States Attorney. During the interview Lu stated that she understood Chen's food stamps to have been obtained in either Manhattan or Philadelphia, and that the food stamps received from Chen were not for food sold. According to Special Agent Edward Saks ("Saks"), Lu confessed during that interview that "she knew that what she was doing was illegal."

### Admission of Testimony as to Zhoa's Class Attendance

■ Lu first challenges the trial court's decision to admit substantial portions of the testimony of Department employees Angela Mackey ("Mackey") and Joe Alston ("Alston"). Although Lu herself never attended a Department food stamp orientation class, the trial judge permitted Mackey and Alston to detail both the content of those orientation classes and Zhoa's attendance. Lu now suggests that it was plain error for the district court to admit that evidence, arguing that it was irrelevant to Lu's state of mind and highly prejudicial to her case. Lu contends that she was severely prejudiced when the jury was allowed to draw the highly speculative inference that Zhoa—Lu's daughter— explained to Lu the food stamp laws.

Department field supervisor Mackey was the first government witness at trial. Though she never had any contact with Lu, Mackey testified to Department's general practices with respect to food stamps. She said that a food retailer must be licensed to accept food stamps, and described how a retailer could obtain that license. Mackey specifically detailed the licensing requirement that an applicant retailer send a representative to a Department orientation class, and explained that merchants were advised at those classes of the illegality of exchanging food stamps for cash. Finally Mackey testified that Department records showed that Zhao had attended a USDA food stamp

orientation class with an interpreter on October 6, 1992.

Department program specialist Alston was the second government witness. Alston testified that he had been the instructor at the October 6, 1992 class. Although he had no specific recollection of that class, he testified to his standard discussion at each class regarding the illegality of purchasing food stamps at a discount. Through Alston's testimony the government introduced a series of 27 slides typically shown at orientation classes. Those slides advised retailers, among other things, that it was unlawful to buy and sell food stamps.

Lu did not object either to Mackey's testimony that Zhao had attended the October 6 class or to Alston's testimony that he had instructed the retailers about the illegality of purchasing food stamps at a discount. Later in the trial, however, when the government sought to introduce evidence showing that Lu and Zhao lived together "to prove the daughter and her mother were in regular contact," the trial judge refused to permit the speculative inference that Zhao shared with Lu her knowledge that selling food stamps was illegal:

> THE COURT: You want me to infer because [Zhao] knew, the mother knew; is that your argument?
>
> MS. WILLIAMS [Assistant United States Attorney]: I want to argue that, yes.
>
> THE COURT: That is speculation. I will not permit that argument to be made. I don't know of any court that has ever said because one conspirator knows, another one knows because there is an inference they must have told them. That is what you are really arguing. That is speculation. You prove your case.
>
> You are not entitled to go to the jury or argue to the jury that the daughter must have told her. This takes the presumption of innocence and turns it right on its head. I don't believe that argument. If that's the case, every conspirator would be guilty because every other conspirator knows. You have to prove that one conspirator told the other.

At no time following that ruling, however, did Lu raise an objection to the earlier-admitted testimony as to Zhao's attendance at Department's food stamp class. Nor did Lu request a curative instruction barring the jury from concluding that Lu knew that her conduct was unlawful based on Zhoa's knowledge.

■ When a trial error is unpreserved by objection, it will not result in reversal unless that error is plain error under Rule 52(b). *United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993) detailed three "limitation[s] upon appellate authority" before reversal is appropriate under that Rule: (1) there must be an "error," (2) that error must be "plain" and (3) that plain error must "affec[t] substantial rights." Further, appellate review under Rule 52(b) is discretionary, not mandatory. *Olano, id.* at 736, 113 S.Ct. at 1779, quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) (alteration in original) directs that a "court of appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" In this instance, however, whether or not the district judge may be viewed as having committed error in admitting the challenged testimony of Mackey and Alston without a curative instruction, that was neither plain error nor an error affecting Lu's substantial rights.

■ Plain error is "an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object" (*United States v. Tillem,* 906 F.2d 814, 825 (2d Cir. 1990)). That standard is not satisfied here. Significantly, the testimony now targeted by Lu came in at the very outset of the government's case—as already said, Mackey and Alston were the first two witnesses. At that early stage the district judge was clearly unaware that the prosecutors had no way to connect up Zhao's knowledge with Lu. In the absence of a contemporaneous objection by Lu's counsel (who presumably should have known of such lack of evidence), the district judge was surely not required to bar that testimony sua sponte. Indeed, substantial portions of Mackey's and Alston's testimony served the perfectly acceptable pur-

pose of establishing background information to the charged offenses, including details of Department's food stamp program, its licensing requirements and Shanghai's involvement in Lu's fraudulent scheme. As we have most recently quoted from earlier case law in *United States v. Birbal,* 62 F.3d 456, 464 (2d Cir.1995):

> The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.

Nor did the admission of the challenged testimony affect Lu's substantial rights. As *Olano,* 507 U.S. at 734, 113 S.Ct. at 1778 teaches, that standard requires the error to have been "prejudicial: It must have affected the outcome of the district court proceedings." In that regard Rule 52(b) typically requires the same sort of "harmless error" inquiry as set out in Rule 52(a), with one substantial difference (*id.*):

> It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice.

■ Our review of the record satisfies us that any arguable error in failing to give a later curative instruction regarding the challenged testimony of Mackey and Alston was harmless. Certainly the Government's case as to Lu's guilty knowledge did not hinge on the possible inference to be drawn from Zhao's attendance at the USDA orientation class. Rather the prosecutors identified several facts as evidence that Lu understood the illegality of her acts:

> * According to the testimony of Special Agent Saks, Lu confessed during the questioning immediately following her arrest that "she knew that what she was doing was illegal."
> * Fa Qing Zhang ("Zhang"), an acquaintance of Lu's who occasionally visited Lu for acupuncture treatment, testified to advising Lu that her food stamp scheme "was a crime." Additionally, Zhang testified that Lu had asked him to leave the room when food stamp suppliers arrived to meet with her, as the person supplying the food stamps "was not willing to be seen."

> * Lu continued to redeem food stamps under Shanghai's license until September 1994, even though Shanghai's Elmhurst store had closed in March 1994.

Significantly the government did not mention the orientation class attended by Zhao during closing arguments. Indeed, the only reference made to that class during the summations was by defense counsel, who emphasized that there was "no evidence that [Lu] ever attended that class." Defense counsel then argued to the jury, without rebuttal, that the government's failure to connect Lu to that class was significant evidence of Lu's lack of guilty knowledge.

In light of defense counsel's approach to the challenged evidence during summation and the government's substantial evidence corroborating Lu's guilty knowledge, we find that Lu has not satisfied her burden under Rule 52(b) of demonstrating prejudice from any asserted trial court error. Hence neither the admission of the now-disputed portions of Mackey's and Alston's testimony nor the lack of a later curative instruction can be said to have affected Lu's substantial rights, and no reversal under Rule 52(b) is called for.

### Lu's Right to Allocution

■ Lu next contends that she was denied her right to a meaningful allocution before sentencing as prescribed by Rule 32(c)(3)(C):

> Before imposing sentence, the court must . . . address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence.

Lu argues that the district judge violated that Rule when he "angrily cut her off several times during her allocution" and "ultimately denied her the opportunity to explain her conduct."

During the sentencing proceeding, Lu requested and the district court denied a downward departure on the basis of what Lu contended was substantial psychological suffering already experienced from her incarceration. On that score the district judge said:

THE COURT: I read the psychiatrist's report. In my view, there was nothing wrong with her mentally then; there is nothing wrong with her now mentally. I think she tries to get the sympathy of every person who ever deals with her, and when it doesn't work, she turns on the ones who deal with her. She has turned on three lawyers assigned to her in this case, all of whom have tried to help her. But that is what she does.

She has committed a crime. She doesn't want to face what she has done. She doesn't want to face the punishment for what she has done, but she is going to face it. All the tears in the world are not going to stop that from happening. Once she gets that through her mind, I think her mental condition will improve.

Ms. Lu, is there anything you want to say before I impose sentence on you?

Lu, through an interpreter, then began her statement in allocution, leading to this exchange:

THE DEFENDANT: Yes, I would like to say I never earned a penny of profit from the food stamp business. I never know that was wrong. If I knew that, I wouldn't do such a thing. I have been an honest person. I haven't money I earned from the food stamp business. I would let your Honor to punish me or whatever you wish to do to me if I earned a big amount of profit from the food stamp business. I am a clear conscience person. But, your Honor, may I relate the whole story to you from the beginning?

THE COURT: No. I was present at the trial. I don't think I have time to listen to the entire trial again. I am not going to reexamine your guilt or innocence here. That is not the purpose of a sentence.

THE DEFENDANT: I did not have the chance to tell you during the trial.

THE COURT: She can say whatever she wants to say within limits, but I am not going to revisit the entire trial nor listen to a two-hour allocution. You can say whatever you would like to say in fifteen minutes.

Lu then proceeded quite emotionally:

THE DEFENDANT: But your Honor does not have the knowledge of what actually happened. I don't want to show this emotion to you in front of your Honor. I don't. I only wanted to operate the store. After a few months, she wanted to sell it to somebody else because the business was no good. She wanted to sell it to Indians. So I talked to my daughter. I have suffered so much because of this operation of this store. Now we sell it for less than the money. Because we have to keep up the reputation. So my daughter said that the business no good, I cannot keep up with the business. I want to let you know that we have a store here, and you can do whatever you wish, to close it, to open it, any time you want. So explain to me that a lot of expense for rent, for other things, it will cost a few thousand per month, I can't take it. She ask me if I wanted to take over the store. I told her, what for? So she said that there is another person called. He might want to take over too. So why don't you join and punish him? So both of us took over that store. After one month I couldn't take it anymore. I wanted to sell it also. We couldn't get rid of it. So we bring in two shareholders, bosses. But the business did not go well, even with these two bosses. Then there was a deliveryman for soft drink—

After that statement had occupied what defense counsel (who was present at Lu's sentencing) represents to have been "just a few minutes," the district judge interrupted:

THE COURT: I am not going to sit here and listen to the entire trial. You have three minutes to finish up, otherwise I am going to terminate it. You have a right to an allocution but not to talk all day.

THE DEFENDANT: But, your Honor, listen to me—

THE COURT: I will listen to you to [sic] for three more minutes.

Lu then continued:

THE DEFENDANT: But I did not make any money. Then I have been incarcerat-

ed for so long. My daughter wasn't there anymore. She wasn't there. Myself and my daughter. My daughter signed. I did not sign it. I don't know English, I don't know law. One of the deliverymen said, oh, this is no good, and told the boss of my store, that I will help you out. So that would supplement your loss. So the boss said, thank you, and then the boss call me. And the boss call me and told me that that—

At that point, the district judge put an end to Lu's allocution. Lu responded so emotionally that she was ordered—and was nearly removed—from the courtroom:

> THE COURT: I think I have been listening long enough. I think she has had about as meaningful an allocution as I can give her.
>
> You can't go on all day. I have heard what you have to say.
>
> Does the government have anything they want to say?
>
> THE DEFENDANT: The lawyers told me not to testify.
>
> THE COURT: I will deal with that on the motion. Go ahead.
>
> MS. WILLIAMS: Your Honor, I will just ask, for purposes of the record, so that we have—
>
> THE DEFENDANT: (Speaking Chinese)
>
> THE COURT: Be quiet or else I will have you removed.
>
> Remove her from the courtroom and we will bring her back when she is more composed.
>
> THE COURT: All right.
>
> If she is quiet, she can stay. Go ahead.

What then followed was a two-question inquiry as to defense counsel's and Lu's opportunity to review the presentence report. And the district judge then continued:

---

3. Having thus found that Lu properly preserved the issue for appeal, we need not decide whether the "plain error" standard would govern Lu's allocution claim in the absence of an appropriate objection below. In light of the obligation that Rule 32(c)(3)(C) imposes upon the sentencing court to invite a defendant's allocution, it is not plain that a defendant should be held to have

> THE COURT: All right. I think we have to proceed with the sentence. I have been listening for twenty minutes and I can't listen all day. I have given her a meaningful allocution but I think if I let her go on much further, we will be here until 4 o'clock this afternoon. I don't think that I am required to do that under the law. If the Court of Appeals thinks I should, they will send it back to me and tell me how long I have to listen. I have listened for 15 to 20 minutes and that is long enough.

■ Before we turn to the merits of Lu's claim, we take a brief look at the appropriate standard of review for Lu's appeal on this issue. It is the United States' position that the district court's actions are to be reviewed only for "plain error" because defense counsel did not object to the district court's limitation on Lu's allocution. While it is true that Lu's counsel voiced no such objection, we find that Lu's comments were themselves sufficient to preserve her Rule 32(c)(3)(C) rights for appeal. As it became clear that the district judge was limiting the scope of Lu's allocution, she continuously protested: "I did not have the chance to tell you during trial" and "But, your Honor, listen to me—." And Lu was nearly removed from the courtroom when she continued to protest the district court's termination of her allocution statement. Indeed, the district judge's own reference to a potential review by this court of the limitation that he had imposed reflects an express awareness of Lu's objection, placing the issue of Lu's Rule 32(c)(3)(C) rights squarely before him. Hence we review the district court's limitation on allocution for any reversible error (3A Charles Alan Wright, *Federal Practice & Procedure: Criminal 2d* § 851, at 294 (2d ed.1982)).[3]

■ Although a defendant's right to a sentencing allocution is a matter of criminal procedure and not a constitutional right (*Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct.

forfeited his or her right to allocution because of any failure to request that opportunity. Other circuits have reached conflicting results on that issue (compare *United States v. De Alba Pagan*, 33 F.3d 125, 129 n. 4 (1st Cir.1994) and cases cited there with *United States v. Cole*, 27 F.3d 996, 998 (4th Cir.1994)).

468, 471, 7 L.Ed.2d 417 (1962)), it is nonetheless considered an "absolute right" in the federal courts (*United States v. Sparrow,* 673 F.2d 862, 865 (5th Cir.1982)). *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) outlined two rights explicitly afforded by Rule 32(c)(3)(C)(then Rule 32(a)): the right to "make a statement in [one's] own behalf" and the right "to present any information in mitigation of punishment." More recently *United States v. Barnes,* 948 F.2d 325, 328 (7th Cir.1991) has discussed both the history and purpose of the Rule:

> The right of allocution allows a defendant to personally address the court before sentencing in an attempt to mitigate punishment. With historical roots in the common law, the opportunity to plead for mercy is another provision in a procedural body of law designed to enable our system of justice to mete out punishment in the most equitable fashion possible, to help ensure that sentencing is particularized and reflects individual circumstances.

Accordingly resentencing is typically appropriate if the sentencing court has not complied with the allocution requirement of Rule 32(c)(3)(C) (*United States v. Margiotti,* 85 F.3d 100, 103 (2d Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 324, 136 L.Ed.2d 238 (1996)).

 As the government points out, Lu's appeal does not present the somewhat more typical situation where a sentencing judge has simply failed to allow the defendant *any* opportunity to address the court before sentence was imposed. Here the judge allowed Lu to address the court for some few minutes—ultimately terminating Lu's allocution after what turned out to be just over two pages of sentencing transcript. Still, the sentencing judge's compliance with Rule 32(c)(3)(C) must not be "merely in form," nor may it "reduce the hearing on sentence to a meaningless formality" (*Sparrow,* 673 F.2d at 865, quoting *United States v. Long,* 656 F.2d 1162, 1165 (5th Cir.1981)). Instead the Rule demands that each defendant be allowed a meaningful right to express relevant mitigating information before an attentive and receptive district judge. Under the circumstances reflected by the record, we find that Lu's right to allocution was sufficiently limited to require resentencing.

Several factors drive that decision. Although the paper record cannot of course replicate the tone of the proceedings below, what the district judge said to Lu immediately before asking for her allocution was plainly a factor that enhanced the problem: There can be no doubt that the "timidity thereby instilled" (*United States v. Sarno,* 73 F.3d 1470, 1503 (9th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 2554, 135 L.Ed.2d 1072 (1996)) contributed to the increasingly emotional nature of Lu's statement—and thus to the sentencing judge's increasing impatience. Additionally, the sentencing judge's repeated interruptions—the first after only nine lines of allocution—and what seems to be a repeatedly shrinking time allotment given to Lu created an atmosphere that obviously rendered it difficult for her to present an effective and potentially persuasive allocution. Both the scope of Lu's statement and her repeated efforts to respond directly to the sentencing judge's admonitions suggest that she was both intimidated and confused. Finally, several aspects of the district judge's part in the process are troubling: the interruptions of Lu's sentences mid-stream, along with remarks such as "I think I have been listening long enough," "I think she has had about as meaningful an allocution as I can give her" and "If the Court of Appeals thinks I should [let her go on much further,] they will send it back to me and tell me how long I have to listen." As the Seventh Circuit warned in *Barnes,* 948 F.2d at 331:

> Because the sentencing decision is a weighty responsibility, the defendant's right to be heard must never be reduced to a formality. In an age of staggering crime rates and an overburdened justice system, courts must continue to be cautious to avoid the appearance of dispensing assembly-line justice.

Of course, as defense counsel properly concedes, a defendant's right to allocution is not unlimited in terms of either time or content. And a 15 to 20 minute allocution is most often ample to satisfy a defendant's Rule

32(c)(3)(C) rights.[4] But in the case at hand, even apart from the fact that the initially-stated time allotment does not appear to have been honored, it does not appear that Lu was able to speak meaningfully of the factors that she legitimately thought relevant to the mitigation of her sentence. We therefore order Lu's sentence vacated, with resentencing to occur after her Rule 32 rights are fully afforded.

■■■ Lu has further asked that her case be assigned to a different district court judge upon remand for resentencing. Unfortunately the government, having taken the position that resentencing is inappropriate in all events, did not address that request in its responsive brief. This Circuit's decisions occasionally evince somewhat different approaches to that determination. Cases such as *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 37 (2d Cir.1988), quoting *United States v. Robin*, 545 F.2d 775, 784 (2d Cir.1976) (Timbers, J., dissenting) (alteration in original) teach that "remanding to a different district judge is an 'extraordinary remedy ... [to] be reserved for the extraordinary case.'" In that light, *United States v. Ming He*, 94 F.3d 782, 795 (2d Cir.1996) suggested that resentencing before a different judge is appropriate only "where special circumstances warrant it, that is, where we are persuaded that the original judge would have substantial difficulty in putting out of her mind her previously expressed views, or where reassignment is advisable to preserve the appearance of justice." On the other side of the coin, cases such as *United States v. Londono*, 100 F.3d 236, 242 (2d Cir.1996) (citations omitted and alterations in original) appear to have taken a somewhat less demanding view of reassignment, focusing that decision less on the potential or actual bias of the district judge than on how reassignment might affect external perceptions of justice:

> To reassign a case on remand, we need only find that "the facts might reasonably cause an objective observer to question [the judge's] impartiality," or "[a]bsent

proof of personal bias requiring recusation," that "reassignment is advisable to preserve the appearance of justice."

Even under that second and perhaps less demanding standard, we do not find reassignment to be appropriate in this case. Lu has identified no special circumstances suggesting that the district judge would be unable to heed this Court's instructions as to her Rule 32(c)(3)(C) rights and to afford her a fair resentencing. We rely on the district judge to give careful consideration to any mitigating comments that Lu might offer during her allocution. Hence we decline Lu's invitation to order the reassignment of her case to a different district court judge.

### *Propriety of Considering Lu's Conduct at Sentencing*

■■■ Lu's final challenge to her sentence stems from an allegedly improper factor considered in the court's sentencing determination. Although Lu was not permitted the full allocution opportunity conferred by Rule 32(c)(3)(C), she was clearly given several moments to speak. And during that time Lu persisted in maintaining her innocence of the crimes charged. Lu now suggests that the district court abused its discretion when it imposed a harsher sentence than it had originally indicated as a direct result of those assertions of innocence during the allocution process.

It is plain that the district court did increase Lu's sentence as result of her comments at sentencing. At the time that he rejected Lu's first argument for a downward departure (advanced on the basis that the loss attributable to her had been inflated), the district court made it clear that he intended to sentence Lu at the bottom of the guideline range:

> I really cannot agree with you that the guideline range in this case overstates the seriousness of her offense. Quite honestly, I think, given the need for general deterrence, etc., she is probably being more lightly treated than perhaps she would

---

4. Note, however, the special problems that are posed when (as here) a non-English-speaking defendant is involved and when all statements—by the court, by counsel and by the defendant himself or herself—must therefore take the added time to be filtered and conveyed through an interpreter.

have been treated pre-guidelines. There are some cases post-guidelines in which people are getting lesser sentences than they would have gotten for this kind of fraud. She might have gotten more time under the old law. I don't say she would have served more time, that is a question, but 37 months is a moderate sentence. Do you want my honest opinion? Given what I know about this case and her performance in this case before, during and after the trial, she is lucky that I don't go up from the bottom of the guidelines rather than departing downward. Your application for a downward departure as a matter of discretion is denied.

After Lu's statements at sentencing, however, the district court imposed a sentence of 42 months:

It is clear to me that there is, as I indicated, a clear need for general deterrence in this case. It is also clear to me that this defendant is absolutely unwilling to recognize or accept responsibility for what she has done. She has a perfect right to her protestations of innocence if she wants to make them, but they do not indicate to me any ability to accept any kind of responsibility. In the face of the evidence that I heard at trial, I am inclined to leniency. I was prepared to give her a sentence at the low end of the guideline range, but her allocution has persuaded me that, in view of her absolute unwillingness to accept responsibility, and her manipulative course of conduct which has occurred since the end of the trial to the present and has persisted through her allocution today, a sentence in mid-guideline range would be proper. Therefore, it is the judgment of the Court that the defendant be sentenced to 42 months' imprisonment. Probation is inapplicable. Supervised release will be for a period of four years.

But any suggestion that it was thus improper—and an abuse of discretion—for the district judge to take her protestations of innocence into account in the sentencing equation is without merit. As we repeated from earlier case law in *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir.1996) (alteration in original), "[t]he sentencing court's discretion is 'largely unlimited either as to the kind of information [it] may consider, or the source from which it may come.'" Sentencing Guidelines Manual § 1B1.4 similarly provides that when determining the sentence to impose within the guideline range, the sentencing court "may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." That surely includes consideration of the defendant's attitude and demeanor at sentencing as factors in determining the appropriate sentence. Indeed, the moderate increase in the sentence imposed by the district judge is substantially less than the two-level enhancement for obstruction of justice that may be imposed when a defendant makes false statements as part of the allocution statement (see, e.g., *United States v. Echevarria*, 33 F.3d 175, 178–79 (2d Cir.1994))—an enhancement that increases the sentencing range by about 25 percent.

In this instance the district court recognized Lu's "perfect right to her protestations of innocence." It found, however, that Lu's manipulative conduct and unwillingness to accept responsibility—which persisted throughout her criminal proceedings and were viewed as having been exhibited once again during her comments at sentencing—were factors appropriate to move her sentence toward the middle of the guideline range. Evaluation of those factors was certainly within the discretion of the sentencing judge. And so while Lu's case is to be remanded for resentencing on the earlier-stated basis, her attack on this added ground does not serve as an independent predicate for the disturbance of Lu's imposed sentence.

### Conclusion

We affirm the district court's decision to admit the challenged testimony of Mackey and Alston and hence affirm Lu's conviction. But we vacate Lu's sentence and remand the case for resentencing in accordance with this opinion.