**Harvey Lee GREEN, Jr.,**
**Plaintiff–Appellant,**

v.

**James B. FRENCH, Warden, Central**
**Prison, Defendant–Appellee.**

No. 97–25.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 29, 1998.

Decided May 13, 1998.

**ARGUED:** Gretchen Marie Engel, Center for Death Penalty Litigation, Durham, NC, for Appellant. Valerie Blanche Spalding, Special Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for Appellee. **ON BRIEF:** Henderson Hill, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, for Appellant. Michael F. Easley, Attorney General of North Carolina, William N. Farrell, Jr., Senior Deputy Attorney General, North Carolina Department of Justice, Raleigh, NC, for Appellee.

Before ERVIN and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge BUTZNER joined. Judge ERVIN concurred separately.

## OPINION

LUTTIG, Circuit Judge:

Petitioner-appellant Harvey Green, who has been sentenced to death by the state of North Carolina on two counts of first-degree felony murder, appeals the decision of the district court dismissing his petition *habeas corpus*. For the reasons that follow, we affirm the judgment of the district court.

### I.

The tragic facts of this case, which we need only summarize here, have been fully set forth by the North Carolina Supreme Court in *State v. Green,* 336 N.C. 142, 153–57, 443 S.E.2d 14, *cert. denied,* 513 U.S. 1046, 115 S.Ct. 642, 130 L.Ed.2d 547 (1994). On December 19, 1983, while committing a robbery at Young's Cleaners in Bethel, North Carolina, petitioner Green bludgeoned to death Sheila Bland, a seventeen-year-old high school student who was working as the store cashier, and John Edmondson, a thirty-three-year-old church organist who was a

store customer at the time. Within a matter of weeks, Green confessed to the crimes to the police. He also showed the police where he hid the murder weapon, which tested positively for blood and the victims' hair, and he turned over to the police the pair of blood-splattered pants that he wore at the time of the killings. On January 16, 1984, the grand jury of Pitt County, North Carolina, returned an indictment of Green on two counts of first-degree felony murder. Green subsequently pled guilty to both counts.

Pursuant to North Carolina law, a capital sentencing proceeding was conducted at which the jury recommended the death penalty for each murder, and the trial court entered judgment accordingly. On appeal, the North Carolina Supreme Court remanded the case for a hearing to determine whether Green's death sentences were unconstitutionally tainted by racial discrimination in jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). A *Batson* hearing was held, after the conclusion of which the lower court determined that there had been no racial discrimination in the selection of Green's jury. The North Carolina Supreme Court subsequently remanded for a second *Batson* hearing, at which the trial court made more detailed findings of fact and again found no *Batson* error.

While Green's sentence was being appealed for the third time, the North Carolina Supreme Court remanded for resentencing in light of the intervening United States Supreme Court case of *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), which held that it violated the Eighth Amendment for North Carolina to instruct a capital sentencing jury—as had occurred in Green's case—that it must unanimously find the existence of any mitigating circumstances.

At Green's second capital sentencing hearing, the jury found three statutory aggravating circumstances: (1) that Green had been previously convicted of a felony involving the use or threat of violence, (2) that the murders of Sheila Bland and Michael Edmondson were for pecuniary gain, and (3) that those murders were part of a course of conduct in which Green committed another crime of violence against another person. Although the jury also found seven mitigating circumstances, it ultimately recommended death sentences for each of the two first-degree felony murders. Judgment, again, was entered accordingly. On appeal, the North Carolina Supreme Court, in a thorough, fifty-eight page opinion, affirmed Green's death sentences against various assignments of error. *State v. Green*, 336 N.C. 142, 443 S.E.2d 14 (1994). The United States Supreme Court denied *certiorari* on December 5, 1994. *Green v. North Carolina*, 513 U.S. 1046, 115 S.Ct. 642, 130 L.Ed.2d 547 (1994).

Green then unsuccessfully sought to challenge his sentences through a motion for appropriate relief under North Carolina's post-conviction relief procedures, and, after that motion was denied, on October 3, 1996, Green filed the instant petition in federal district court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. The district court dismissed Green's *habeas* petition, *Green v. French*, 978 F.Supp. 242 (E.D.N.C. July 16, 1997), and Green appealed.

## II.

Green's petition for federal *habeas* relief was filed after the date on which the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, 110 Stat. 1214, was signed into law. Accordingly, Green's claims are governed by the new standards for federal *habeas corpus* as amended by the AEDPA. *See Lindh v. Murphy*, —— U.S. ——, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997) (holding that the provisions of the AEDPA amending 28 U.S.C. § 2254 only govern *habeas* petitions filed after April 24, 1996, the effective date of enactment of the AEDPA); *Breard v. Pruett*, 134 F.3d 615 (4th Cir.1998) (holding that the provisions of the AEDPA amending 28 U.S.C. § 2254 apply to *habeas* petitions filed after April 24, 1996).

Section 2254 provides that "a district court shall entertain an application for a writ of *habeas corpus* in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in

violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Section 2254(d)(1), as amended by the AEDPA, now provides, in relevant part, that such an application

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claims—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ...

28 U.S.C. § 2254(d)(1). Amended section 2254(d)(1) therefore places at least three limitations upon the availability of federal *habeas* relief: the petitioner must demonstrate that the state court's adjudication of his federal claim was (1) contrary to or an unreasonable application of (2) clearly established federal law (3) as determined by the Supreme Court of the United States. The proper constructions of these limitations are matters of first impression in this circuit.

### A.

As a prerequisite to obtaining *habeas* relief under amended section 2254(d)(1), a petitioner must demonstrate that the state court's adverse adjudication of the merits of his federal claim was "contrary to" or an "unreasonable application of" clearly established law as determined by the Supreme Court.

Correctly defining "contrary to" and "unreasonable application of," and distinguishing between the two terms for purposes of section 2254(d)(1), at first blush appears relatively simple. Upon reflection, however, it is evident that this appearance is deceptive, and that the intended meaning of these terms is not so clear at all. For, at least in common legal parlance and practice, not only is each of these terms invoked to describe various kinds and degrees of relationship between inferior and supreme court decisions, but, as well (or as a consequence), there is overlap between the phrases.

A lower court's decision, for example, certainly is said to be "contrary to" supreme court precedent when, through resolution of a question of pure law, that decision reaches a legal conclusion or a result opposite to that reached in a supreme court opinion which addresses the identical question of law. A lower court's decision is likewise "contrary to" a higher court's precedent when that decision correctly identifies the governing legal principle from the precedent but applies that principle to facts that are indistinguishable in any material respect from those on the basis of which the precedent was decided in such a way as to reach a conclusion different from that reached by the higher court. It is also common to characterize a lower court decision as "contrary to" supreme court precedent when that decision applies a precedent in a factual context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is indisputably unjustified, or, conversely, when that decision fails to apply a precedent in a different context to which the precedent's principle clearly does apply.

The phrase "unreasonable application of" supreme court precedent is similarly invoked to describe various kinds and degrees of relationships between an inferior court decision and a superior court decision. A lower court is said to have unreasonably applied a higher court's precedent when it extends the legal principle of that precedent to a new context in which the application of that principle is not reasonable, or conversely, as above, when, unreasonably, it fails to extend a principle to a context to which the principle should be extended. But it is also considered to be an "unreasonable application of" a supreme court precedent when an inferior court applies the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it, assuming the facts are not so different from those that gave rise to the precedent as to constitute an entirely new context, requiring examination anew of the applicability of the principle. (If the facts are sufficiently different from those of the precedent, then the application of the principle to those facts may entail not so much the mere application of law to fact, as customarily understood, but, rather, the application of the legal principle to an entirely new context.).

That the terms "contrary to" and "unreasonable application of" precedent, variously invoked, substantially overlap in common legal parlance is apparent. A decision in which a state court commits the error of unjustifiably applying a supreme court precedent in a different factual context from the one in which the precedent was decided, and a decision committing the converse error—the third and fourth examples above—are characterized interchangeably as decisions "contrary to" a supreme court precedent and decisions involving the "unreasonable application of" that precedent. And the first two examples of a decision "contrary to" precedent might just as well be termed "unreasonable applications of" the higher court's precedent, as might the second example of an "unreasonable application of" precedent be termed a decision "contrary to" precedent.

Recognition of the fact that the phrases "contrary to" and "unreasonable application of" a higher court's precedent have overlapping meanings in common · parlance, however, is only to identify the interpretive conundrum of the statute. The difficult question is precisely what meaning to accord each term in light of these overlapping meanings and the overarching canon of construction that each term should be construed so as to accord it a meaning different from, and independent of, the other. Ultimately, we believe that according each term its most natural (even if not its only) meaning, results in an interpretation of the statute most faithful to the plain purpose of the statute.

▮ On these understandings of the terms, a decision is "contrary to" precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue. In contrast, a decision represents an "unreasonable application of" precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it (assuming the facts are insufficiently different from those that gave rise to the precedent as to constitute a new context for consideration of the principle's applicability).

Defining the terms in this manner, respectively, captures, we believe, the obvious common sense of the statute: If a state court decision is in square conflict with a precedent (supreme court) which is controlling as to law and fact, then the writ of *habeas corpus* should issue; if no such controlling decision exists, the writ should issue only if the state court's resolution of a question of pure law rests upon an objectively unreasonable derivation of legal principles from the relevant supreme court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts. In other words, *habeas* relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable. As the Fifth Circuit has explained,

> The use of the word "unreasonable" in formulating this restrictive standard of review implicitly denotes that federal courts must respect all *reasonable* decisions of state courts. Thus, given the statutory language, and in the light of legislative history that unequivocally establishes that Congress meant to enact deferential standards, we hold that an application of law to facts is *unreasonable* only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.

*Drinkard v. Johnson,* 97 F.3d 751, 769 (5th Cir.1996); *id.* at 769 (holding that state court's application of law to fact was not "unreasonable" because majority and dissent

of court of appeals disagreed over whether state court correctly applied the law to the facts); *see also Lindh v. Murphy*, 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds*, —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (suggesting that purpose of "unreasonable application of" clause is, not unlike *Teague*, to "validate[ ] reasonable, good-faith interpretations of existing precedents made by state courts" (quoting *Butler v. McKellar*, 494 U.S. 407, 414, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990))); *id.* at 871 ("The Supreme Court of the United States sets the bounds of what is 'reasonable'; a state decision within those limits must be respected—not because it is right ... but because the grave remedy of upsetting a judgment entered by another judicial system after full litigation is reserved for grave occasions.").

Like our court, our sister circuits are only beginning to consider the new amendments to section 2254(d)(1) and their application to the various aspects of judicial decisionmaking described above, but the emerging interpretations of these terms are consistent with ours today, even if they are alternatively formulated and yet inchoate. Those circuits that have thus far addressed themselves to the amendments, and to section 2254(d)(1) in particular, clearly agree with us that the category of state court decisions that are "contrary to" supreme court precedent includes those cases in which a state court's decision of a question of pure law is in irreconcilable conflict with a controlling resolution of that same legal question by the supreme court. *Lindh*, 96 F.3d at 871, 877 (referring to category as comprising cases resolved on the basis of "concrete entitlements" or "core legal issues" as determined by the Supreme Court); *compare id.* at 869 ("[s]o if, for example, the Supreme Court of Wisconsin had held that the Confrontation Clause does not entitle defendants to cross-examine witnesses to establish bias, then *Davis v. Alaska* would show that the decision is 'contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States' ..."), *with Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (invalidating robbery and burglary conviction of defendant who was not permitted to cross-

examine key prosecution witness for bias); *see also Drinkard*, 97 F.3d at 768 (referring to category as comprising cases resolved on the basis of a "purely legal question" determined by the Supreme Court); *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir.1998) ("a state court decision would be 'contrary to' clearly established Supreme Court case law ... [when] a state court, in contravention of Supreme Court case law, fails to apply the correct legal principles to decide a case."). Indeed, these circuits may believe that the category of decisions "contrary to" supreme court precedent excludes all other decisions of pure law as to which there is no supreme court precedent directly controlling as to both law and fact. *See, e.g., Lindh*, 96 F.3d at 876 (concluding that state court decision was not contrary to clearly established Supreme Court law because petitioner's claim that he was entitled to cross-examine a witness for bias during the dispositional phase of bifurcated proceeding "would be a nontrivial extension of current law," given that Supreme Court "has not yet so held" that "all [such] testimony ... must be subject to cross-examination"); *Drinkard*, 97 F.3d at 768–69 (stating generally that all purely legal questions are reviewed under "contrary to" clause, but holding only that state court decision applying directly on point Supreme Court precedent was not "contrary to" precedents); *Neelley*, 138 F.3d 917, 923–24 (discussing situations where state court decision is "contrary to" relevant law to include only "when a state court faces a set of facts that is essentially the same as those the Supreme Court has faced earlier, but given these facts the state court reaches a different legal conclusion than that of the Supreme Court," and "a state court, in contravention of Supreme Court case law, fails to apply the correct legal principles to decide a case"). These courts have not differentiated (at least not explicitly) between state court decisions resting entirely on the erroneous resolution of pure questions of law and decisions that incorrectly apply the correct purely legal principle to facts that are so similar to those of the precedent as to be considered indistinguishable. But from their analyses, it is clear these courts would (if they do not already, implicitly) regard these latter deci-

sions, also, as "contrary to" precedent. *See, e.g. Neelley,* 138 F.3d 917, 923–24.

Our sister circuits have also clearly held that a state court decision is an "unreasonable application of" precedent when that decision invokes the correct principle from the precedent, but unreasonably applies that principle to facts similar to (in contrast to indistinguishable from) those of the precedent. *See Lindh,* 96 F.3d at 871 (citing case addressing question of *"how long is too long"* for purposes of Speedy Trial Clause as example of case analyzed under "unreasonable application of" clause of section 2254(d)(1)); *id.* at 876 ("The Supreme Court of Wisconsin asked the *legally* correct question by inquiring whether the trial judge abused his discretion; this is exactly how [the United States Supreme Court case of] *Van Arsdall* poses the issue. And the fact-specific answer cannot be called 'unreasonable' even if it is wrong."); *Drinkard,* 97 F.3d at 767 (stating that "unreasonable application of" clause refers to "questions that require the application of law to facts"); *id.* at 768–69 (holding state conviction not "unreasonable application of" federal law because reasonable judges could disagree about the application of *Lockett* and *Eddings* to the facts of the state court case); *Neelley,* 138 F.3d 917, 923–24. In so holding, though, these circuits have, to date, considered the "unreasonable application of" precedent in reference only to facts that were sufficiently similar to the facts of the Supreme Court precedent as not to raise a question as to the applicability of the precedent *vel non.* They do not appear to have considered, or at least to have considered fully, the related circumstance where the state decision applies (or refuses to apply) a precedent in a factual context sufficiently different from the one in which the precedent was decided that the state court's action is more appropriately considered not the mere application of law to fact, but, rather, the extension (or nonextension) of a legal principle to an entirely new context. In *Lindh,* for example, at the point of the opinion where the court might have had to address squarely the precise contours of the "contrary to" clause itself vis-a-vis the precise contours of the "unreasonable application of" clause, the court was able to sidestep these issues by

determining instead that there was no clearly established Supreme Court precedent holding that a particular principle extended to a new context, obviating the need to decide the meaning of the term "contrary to," much less the differences between the meanings of "contrary to" and "unreasonable application of" in this context. 96 F.3d at 876 (noting that Supreme Court has never held that the Confrontation Clause applies to testimony at dispositional phase of bifurcated proceeding and concluding therefore that "we think it impossible to say that 'clearly established federal law, as determined by the Supreme Court of the United States'" entitled petitioner to cross-examine witness). *See also Neelley,* 138 F.3d 917, 923–24 (not discussing the category of the application of a legal principle to a new context). When ultimately forced to confront the issue, these courts, to be sure, could analyze decisions addressing this related circumstance under the "contrary to" clause. In particular, although we confess to confusion over the *Lindh* opinion and its seemingly internally inconsistent passages, we acknowledge that opinion does imply that such an analysis might be appropriate. However, if ultimately forced to decide the question, we believe it more likely that these courts would decide that such decisions are properly analyzed under the "unreasonable applications of" clause of section 2254, and that they will regard such decisions as "unreasonable applications of" the precedent if the extension or nonextension of the legal principle was objectively unreasonable. *Compare id.* at 870 (stating that in every instance where "the dispute lies . . . in the meaning of the Constitution" review is to proceed under "contrary to" clause), *with id.* at 877 (limiting "contrary to" clause to decisions of "core" legal issues), *and id.* at 871 ("For current purposes it is enough to say that when the constitutional question is a matter of degree, rather than of concrete entitlement, a 'reasonable' decision by the state court must be honored."). Any other method of analysis would not only be in tension with the language of the statute itself, which makes no distinction at all between the application of a legal principle to a new context and the application of such a principle to a particular set of facts, but

would fail to accord independent meaning to each of the three limitations on granting the writ expressly imposed by the amendment—namely, that the state court decision be (1) "contrary to" or an "unreasonable application of" (2) "clearly established Federal law" (3) "as determined by the Supreme Court of the United States."

But whether our sister circuits analyze state court decisions involving the extension of a principle to a new context under the "contrary to" clause or the "unreasonable application of" clause of section 2254(d)(1) appears to be of little, if any, practical significance ultimately, because of the manner in which these courts interpret the second and third limitations in the amendments to section 2254(d)(1) that the state decision must have been in conflict with "clearly established federal law" "as determined by the Supreme Court of the United States." In order to obtain *habeas* relief, the petitioner must show that the state court decision conflicted with "clearly established federal law as determined by the Supreme Court." According to these courts, to make this showing in the context of the extension of a principle to a new context, the petitioner must demonstrate that no reasonable jurist would disagree that, based upon the relevant (even if not directly controlling) Supreme Court's precedents, the principle should extend (or not extend) to the new context. *See Lindh*, 96 F.3d at 869–70 (the "clearly established" formulation "is unlikely to pose a different kind of interpretive challenge" to that under *Teague* [*v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)] which "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions"); *Neelley*, 138 F.3d 917, 924 ("The 'clearly established' language echoes the concerns underlying the Supreme Court's decisions in *Teague v. Lane* and its progeny .... [and w]e think that a similar analysis obtains under the 'clearly established' language of § 2254, as a rule that is 'new' cannot be 'clearly established.'"). If no reasonable jurist would disagree over the applicability of the principle to the new context, then the petitioner will have shown not only that the state decision was "contrary to" clearly es-

tablished precedent on an understanding of section 2254(d)(1) that analyzes extensions of principle to new contexts under the "contrary to" clause of the section; he also will have shown that the decision was an "unreasonable application of" clearly established law on an understanding of the section that analyzes such extensions under the "unreasonable application of" clause. And the writ will issue.

### B.

■ The AEDPA also limits *habeas* relief to those petitioners who can demonstrate that the state court's adjudication of their federal claims was inconsistent with "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Petitioner Green urges us to interpret this limitation as essentially codifying the anti-retroactivity doctrine of *Teague v. Lane*. 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *See* Reply Br. at 13 ("The question of whether Appellant's claim is *Teague*-barred or precluded by the AEDPA is the same question."). To be sure, we agree with petitioner that this provision of section 2254(d)(1) imports an anti-retroactivity principle into federal *habeas* law by requiring a *habeas* petitioner to demonstrate that the state court's resolution of his claim was inconsistent with federal law that was clearly established at the time his conviction became final. 28 U.S.C. § 2254(d) (limiting *habeas* relief to any claim that "was adjudicated" on the merits in state court unless that decision "was" inconsistent with "clearly established Federal law"). Nevertheless, we decline to interpret this provision of section 2254(d) as simply codifying the *Teague* doctrine, because that doctrine is different from section 2254(d) in subtle, but several, respects. First, section 2254(d) makes no reference to the two traditional exceptions under *Teague*, compare 28 U.S.C. § 2254(d), with *Teague v. Lane*, 489 U.S. at 311–12, 109 S.Ct. at 1075–76 (noting exceptions from *Teague* anti-retroactivity doctrine for new rules which either "place[] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe" or are "watershed rules of criminal procedure" (internal quotation marks and citations omitted)), which is at

least some evidence that Congress understood section 2254(d) to impose a different type of limitation upon *habeas* review. Second, section 2254(d) nowhere employs the "new rule" language of *Teague*, even though other provisions of the AEDPA do so unmistakably.[1] And, finally, the anti-retroactivity principles of *Teague* would appear applicable in contexts where the limitations of section 2254(d)(1) are not, such as where a *habeas* petitioner's constitutional claim is not properly raised in state court and therefore not "adjudicated on the merits in State court," 28 U.S.C. § 2254(d), but where a court may nonetheless conclude that the failure to properly raise the claim in state court is not excused (or perhaps, excused but *Teague*-barred) because the claim relies upon a new rule of constitutional law not made retroactive on collateral review. *Compare Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) (novelty of constitutional claim is cause for failure to raise the claim in state court) *with Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (novel claims generally not cognizable on federal *habeas* review). Because section 2254(d) is different from *Teague* in at least these three respects, we decline to interpret the "clearly established" language of the AEDPA as simply codifying the existing non-retroactivity doctrine of *Teague*.

## C.

■ The AEDPA also limits the source of clearly established law to that "determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Almost as an afterthought, and apparently for the first time on appeal, Green argues that this limitation unconstitutionally constricts the *habeas* juris-diction of the federal courts in two ways, and he urges us to construe this source of law limitation out of the statute in order to save the AEDPA from constitutional infirmities. We find neither of Green's arguments as to the unconstitutionality of this limitation persuasive.

First, Green contends that, to the extent the AEDPA limits the source of law cognizable on *habeas* to Supreme Court precedent, it violates the separation of powers by vesting federal courts with jurisdiction to decide disputes and then "dictating the judiciary's determination of governing law." Appellant's Br. at 34 (quoting *Lindh*, 96 F.3d at 887 (Ripple, J., dissenting)). *See* U.S. Const. Art III § 1 ("The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is"); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). Appellant's reliance on *Plaut* is misguided, however, because unlike the statute at issue in that case, the amendments to section 2254(d)(1) do not offend the separation of powers by purporting to legislatively reopen a final judgment. In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of *habeas* cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case. And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any

---

1. The provisions of the AEDPA which amended section 2254(e) by limiting the availability of evidentiary hearings provide:

 If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
 (A) the claim relies on—(i) *a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court*, that was previously unavailable ...
 28 U.S.C. § 2254(e)(2) (emphasis added). Similarly, in newly-enacted section 2264, which sets forth standards for procedural defaults of federal claims in capital cases in opt-in states, Congress exempted defaulted claims where "the failure to raise the claim properly is—... (2) the result of the Supreme Court's recognition of *a new Federal right that is made retroactively applicable*." 28 U.S.C. § 2264(a). These two AEDPA amendments plainly employ the same "new rule" language found in the Supreme Court's *Teague* line of cases, demonstrating that Congress was fully aware of, and able to invoke, the *Teague* doctrine, if it so chose.

Article III case or controversy. Under the AEDPA, we are free, if we choose, to decide whether a *habeas* petitioner's conviction and sentence violate any constitutional rights. Section 2254(d) only places an additional restriction upon the scope of the *habeas* remedy in certain circumstances. *Lindh*, 96 F.3d at 872 ("[r]egulating relief is a far cry from limiting the interpretive power of the courts, however, and Congress has ample power to adjust the circumstances under which the remedy of the writ of habeas corpus is deployed."). As the Seventh Circuit pointed out in *Lindh* in great detail, such a limitation upon the scope of a remedy is entirely ordinary and unexceptionable, even when the remedy is one for constitutional rights. *See Lindh*, 96 F.3d at 870–73; *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 3430, 82 L.Ed.2d 677 (1984) (good faith exception to Fourth Amendment exclusionary rule); *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (independent discovery doctrine); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Fourth Amendment claims that were capable of full and fair litigation in state court are not generally cognizable in federal *habeas* review); *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (new rules not made retroactive are not cognizable on federal *habeas* review); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (qualified immunity to damages actions claiming official action violated constitutional liberties). Moreover, even if section 2254(d) does limit the interpretive power of the lower federal courts in some sense, that limitation is tantamount to other such choice of law limitations which are widely accepted and have never been thought to raise Article III problems. *See Lindh* at 870–73 (discussing non-constitutional contexts—such as *res judicata*, *Erie*, and federal court certification of state law issues—where federal courts are often bound by another tribunal's interpretation of law).

■ Green's second constitutional argument relating to the construction of section 2254(d)(1) relies upon the Suspension Clause. The Suspension Clause, of course, provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. Art. I § 9. We confess to confusion over Green's abbreviated argument on this score. Apparently, Green's argument is that *any* statutory modification of the availability of *habeas* relief that "sharply limits" a federal court's power to grant the writ "threatens a violation of the Suspension Clause." Reply Br. at 17. And so (the argument goes, or would go) because the provision of section 2254(d)(1) which limits the source of law cognizable on *habeas* review to that established by the Supreme Court would (presumably) amount to a "sharp limitation" upon the scope of the writ, section 2254(d)(1) must be construed to permit lower federal courts sitting in *habeas* to issue the writ based only upon an inconsistency between their own precedents and a state court's adjudication of a federal claim. Green does not, however, articulate *why* the source of law limitation of section 2254(d)(1) violates the Suspension Clause, nor does he cite to any authority defining the contours of the Suspension Clause, or invalidating any federal statute on Suspension Clause grounds.

From our review of the few precedents interpreting the Suspension Clause, we conclude that amended section 2254(d)(1) does not suspend the privilege of the writ, but rather, represents a modest congressional alteration of the standards pursuant to which the writ issues. *See Lindh*, 96 F.3d at 867 ("to alter the standards on which the writ issues is not to 'suspend' the privilege of the writ."). As the Supreme Court and other courts have repeatedly recognized, it is generally the Congress' prerogative to define the scope of the writ of *habeas corpus*. *See Felker v. Turpin*, 518 U.S. 651, 663–65, 116 S.Ct. 2333, 2340, 135 L.Ed.2d 827 (1996) ("we have long recognized that 'the power to award the writ by any of the courts of the United States, must be given by written law,' and we have likewise recognized that judgments about the proper scope of the writ are 'normally for Congress to make.'" (citations omitted)); *United States v. MacCollom*, 426 U.S. 317, 96 S.Ct. 2086, 48 L.Ed.2d 666 (1976) (plurality) (rejecting Suspension Clause challenge to provision of 28 U.S.C.

§ 753(f)); *Lindh,* 96 F.3d at 868 ("Collateral review of judgments . . . is subject to legislative control" as evidenced by section 14 of the Judiciary Act of 1789 which "prohibited any inquiry by the federal courts into the propriety of state custody" as well as the Congressional repeal in 1868 of the "first created general power of collateral review"). *See also Wright v. West,* 505 U.S. 277, 297–306, 112 S.Ct. 2482, 2493–98, 120 L.Ed.2d 225 (1992) (O'Connor, J.) (arguing against a proposed construction of section 2254(a) similar to our interpretation of section 2254(d) without concluding any Suspension Clause violation); *id.* at 305–06, 112 S.Ct. at 2497–98 (apparently acknowledging congressional authority to amend section 2254 in a manner similar to our interpretation of section 2254(d)(1)). In fact, very recently in *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), the Supreme Court rejected a Suspension Clause challenge to a provision of the AEDPA that limited successive *habeas* petitions. By analogy, we believe Congress can, without offending the Suspension Clause, similarly narrow the source of law cognizable on *habeas* review of petitions from prisoners in custody pursuant to state court judgments.

This conclusion is confirmed by the history of the writ of *habeas corpus,* which is far broader in scope today than it was at the time that the Suspension Clause was ratified. As the Supreme Court recently discussed in *Felker:*

> The writ of habeas corpus known to the Framers was quite different from that which exists today. As we explained previously, the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority. *See Ex parte Dorr,* 3 How. 103, 44 U.S. 103, 11 L.Ed. 514 (1845). The class of judicial actions reviewable by the writ was more restricted as well. In *Ex parte Watkins,* 3 Pet. 193, 28 U.S. 193, 7 L.Ed. 650 (1830), we denied a petition for a writ of habeas corpus from a prisoner "detained in prison by virtue of the judgment of a court, which court possesses general and final jurisdiction in criminal cases." *Id.* at 202. Reviewing the English common law which

informed American courts' understanding of the scope of the writ, we held that "[t]he judgment of the circuit court in a criminal case is of itself evidence of its own legality," and that we could not "usurp that power by the instrumentality of the writ of habeas corpus." *Id.* at 207.

> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." And it was not until well into this century that this Court interpreted that provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas. *See, e.g. Waley v. Johnston,* 316 U.S. 101, 62 S.Ct. 964, 86 L.Ed. 1302 (1942); *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

*Felker v. Turpin,* 518 U.S. 651, 663, 116 S.Ct. 2333, 2340, 135 L.Ed.2d 827 (some citations omitted). This history strongly suggests that the AEDPA's modest constriction does not violate the Suspension Clause, as originally understood. *See Lindh,* 96 F.3d at 867 (reviewing historical evidence and concluding "there was (and is) no constitutionally enshrined right to mount a collateral attack on a state court's judgment in the inferior Article III courts and, *a fortiori,* no mandate that state court judgments embracing questionable (or even erroneous) interpretations of the federal Constitution be reviewed by the inferior Article III courts"); *United States v. Anselmi,* 207 F.2d 312, 314 (3rd Cir.1953) ("[I]t would appear that the complete denial of the writ of *habeas corpus* to convicted federal prisoners would not violate the Constitution[ f]or under the English Habeas Corpus Act of 1679, as well as under the common law in force when the Constitution was adopted, *habeas corpus* was not available to persons convicted of crime to test the legality of their conviction." (citations omitted)). Therefore, we conclude that this provision of the AEDPA fits comfortably with both recent Supreme Court precedent interpreting the Suspension Clause, as well as the original meaning of the Clause itself.

### III.

■ Green's first constitutional claim is that the trial court denied him due process of law by rejecting his request for an allocution.[2] On August 17, 1992, during his second capital sentencing proceeding, Green moved the court for an order permitting him to have an "allocution at the appropriate time before the jury retires to deliberate." J.A. vol. II at 449. The court denied Green's motion, but ultimately permitted Green to place his proposed statement into the record, presumably for purposes of appellate review. J.A. vol. II at 451. That proposed allocution is an approximately ten page statement that details aspects of Green's life story, specifically, how his earlier crime of attempting to rape a woman while he was in the Army led to his dishonorable discharge; his inability to find gainful employment; his descent into alcohol and drug abuse; and his poverty, which he claims eventually forced him to forge checks in his father's name and then steal money from Young's Cleaners in order to pay it back. Second Sentencing Transcript at 2216–2225. In his statement, Green denies having had the intent to kill his victims; he explains that he was simply "trying to rob [Young's Cleaners] with a toy gun," id. at 2222, and that he "didn't mean to hurt anyone" when he killed Sheila Bland and Michael Edmondson. Id. at 2224. The proposed allocution concludes with Green's plea for the jury's forgiveness. Id. 2225.

On appeal to the North Carolina Supreme Court, Green argued, as he does today, that a trial court deprives a criminal defendant of due process of law when it denies his effectively communicated request to plead for mercy with the jury prior to the imposition of his sentence. In support of this argument, petitioner Green relies upon the fact that some right of allocution has been protected since the time of English common law. See, e.g., Ball v. United States, 140 U.S. 118, 129, 11 S.Ct. 761, 765, 35 L.Ed. 377 (1891); Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) (plurality opinion of Frankfurter, J.). For further support

of his constitutional claim, Green relies upon language in various Supreme Court opinions that, in dissent, concurrence, or otherwise in dicta, refers to the common law right of allocution as "ancient in the law," United States v. Behrens, 375 U.S. 162, 165, 84 S.Ct. 295, 296–97, 11 L.Ed.2d 224 (1963) (opinion of Black, J.), a "traditional right," id. at 167, 84 S.Ct. at 297–98 (opinion of Burger, C.J.), "elementary right," id. (Harlan, J., concurring), of "immemorial origin," McGautha v. California, 402 U.S. 183, 217, 91 S.Ct. 1454, 1472, 28 L.Ed.2d 711 (1971), and of significance because "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." Green, 365 U.S. at 304, 81 S.Ct. at 655. Finally, Green relies upon lower court opinions holding that due process protects the practice of allocution. See Ashe v. North Carolina, 586 F.2d 334 (4th Cir. 1978); Boardman v. Estelle, 957 F.2d 1523 (9th Cir.1992).

The North Carolina Supreme Court, after canvassing the history of the common law right of allocution, as well as the Supreme Court and lower court precedents relied upon by Green, ultimately concluded that there is no constitutional right to allocution, at least where, as in Green's case, the defendant seeks to use allocution as a vehicle for presenting unsworn (and often factual) testimony to the sentencing jury without subjecting himself to government cross-examination. Green, 336 N.C. at 190–93, 443 S.E.2d 14. Based upon our own independent review of the applicable law, we cannot conclude that the North Carolina court's rejection of Green's allocution claim was "contrary to, or involved an unreasonable application of" "clearly established Federal law," "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

### A.

Green relies primarily upon three decisions of the Supreme Court: *Green v. United*

---

2. See Black's Law Dictionary (6th ed.1990) ("allocution" is the "[f]ormality of a court's inquiry of defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on verdict of conviction; or, whether he would like to make statement on his behalf and present any information in mitigation of sentence").

*States,* 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); *United States v. Behrens,* 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963); and *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). None of these precedents, however, "clearly establishes" Green's due process claim.

First, petitioner's reliance upon *Green v. United States,* 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961), is, we believe, ultimately misguided. In *Green,* the Supreme Court affirmed the sentence of a federal criminal defendant who claimed he had been denied his right to allocute guaranteed by Rule 32(a) of the Federal Rules of Criminal Procedure. At that time, Rule 32(a) required the court to "afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment." *Id.* at 303 n. 1, 81 S.Ct. at 655 n. 1. In *Green,* the sentencing court asked the defense, "[d]id you want to say something?", at which time the defendant's *lawyer* made a plea for leniency, but the defendant *himself* never made any statement on his own behalf. *Id.* at 302, 81 S.Ct. at 654. Several years after the sentence, the defendant moved to vacate his sentence on the grounds that he had not been *personally* afforded an opportunity to speak, as required by Rule 32(a).

The Supreme Court in *Green* affirmed the sentence. Justice Frankfurter, joined by seven Justices on this point, looked to the common law tradition of personal allocution and construed Rule 32(a) in light of that history as creating a personal right even though the language of Rule 32(a) did not clearly do so. *See id.* at 302, 81 S.Ct. at 654 (plurality opinion of Frankfurter, J., joined by Justices Clark, Whittaker, and Harlan); *id.* at 307, 81 S.Ct. at 656–57 (dissenting opinion of Black, J., joined by the Chief Justice and Justices Douglas and Brennan). However, Justice Frankfurter went on to conclude that the defendant had not carried his burden of proving that he was denied any personal right because the trial judge's question "[d]id you want to say something?" might have been directed toward the defendant himself who may have chosen to speak through his attorney. In this conclusion, Justice Frankfurter was joined by three other Justices. Justice Stewart concurred in the result on the grounds that Rule 32(a) created no personal right at all. *Id.* at 306, 81 S.Ct. at 656 (opinion of Stewart, J., concurring) ("Rule 32(a) does not seem to me clearly to require a district judge in every case to volunteer to the defendant an opportunity personally to make a statement, when the defendant has a lawyer at his side who speaks fully on his behalf."). Finally, after finding defendant Green's sentence to be legal, Justice Frankfurter opined that in future cases, and "as a matter of good judicial administration," sentencing judges should "unambiguously address themselves to the defendant" when complying with the requirements of Rule 32(a). *Id.* at 305, 81 S.Ct. at 655–56. Rule 32(a) was subsequently amended to reflect Justice Frankfurter's suggestion. *Compare id.* at 303 n. 1, 81 S.Ct. at 655 n. 1 (text of old Rule 32(a)), *with* Rule 32(c)(3)(C) (before imposing sentence the court shall "address the defendant personally and ask the defendant if the defendant wishes to make a statement and to present any information in mitigation of punishment").

Thus, *Green* does not "clearly establish" any due process right to allocution. The opinion simply interpreted Rule 32(a) in light of its common law origins. The opinion never held, nor did any of the Justices even hint, that the right to allocution is protected by the Due Process Clause. *See, e.g., Green,* 365 U.S. at 307, 81 S.Ct. at 656–57 (Black, J., dissenting) (referring to allocution as a "common-law right" and mandated by "Federal Criminal Rule 32(a)"). In fact, the plurality opinion of Justice Frankfurter instructed the lower federal courts in future cases to address defendants personally only as a matter of "good judicial administration"—not as a matter of constitutional right. *Id.* at 305, 81 S.Ct. at 655–56. Moreover, the Court in *Green* evidenced little solicitude for the practice of allocution; the plurality opinion of Justice Frankfurter indicated that it declined to vacate the defendant's sentence because the defendant could *not* prove that he had *not* waived his personal rights under Rule 32(a), *id.* at 305, 81 S.Ct. at 655–56 ("[i]t may well be that the defendant himself was recognized and sufficiently apprised of his right to

speak and chose to exercise this right through his counsel"), even though the government had admitted in its brief that the sentencing judge's question "[d]id you want to say something?" was addressed to the defendant's counsel and not the defendant himself. *Id.* at 310, 81 S.Ct. at 658 (Black, J., dissenting). Therefore, reading the *dicta* in *Green* regarding the ancient origins of allocution in the context of what the Court actually did in that case, we cannot conclude that *Green* clearly established any substantial due process right to allocution. *Cf. id.* at 311, 81 S.Ct. at 658 (Black, J., dissenting) (arguing that the Supreme Court in *Green* was not enforcing the right of allocution but rather was "merely prais[ing it] in resounding glittering generalities calculated to soften the blow of nonenforcement").

Neither does *United States v. Behrens* "clearly establish" any due process right to allocution. 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963). That case held, at most, that a trial court cannot modify a defendant's temporary sentence, in the defendant's absence, without violating Rule 32(a). Again, the opinion only interpreted Rule 32(a), and 18 U.S.C. section 4208(b) (the provision for sentence modification), and did not in any way suggest that a right of allocution applied in state criminal proceedings by operation of the Due Process Clause. *See, e.g. id.* at 165, 84 S.Ct. at 296–97 (opinion of Black, J.) (allocution in federal criminal cases is "recognized by Rule 32(a)"); *id.* at 167, 84 S.Ct. at 297–98 (opinion of Harlan, J., concurring) (allocution in federal criminal cases is "embodied in Rule 32(a)").

The case of *Hill v. United States* is particularly unsupportive of Green's due process claim. 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). In *Hill,* the Supreme Court held that a federal trial court's failure to follow the formal requirements of Rule 32(a) and ask a defendant represented by an attorney whether he had anything to say before sentence is imposed, was not cognizable in a later *habeas* challenge to the sentence under 28 U.S.C. § 2255. *In the face of the established practice of allowing allocution, the Court in Hill held that a federal court's failure to comply with that practice as re-*

*quired by the Federal. Rules of Criminal Procedure was*

> *an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure.*

*Id.* at 428, 82 S.Ct. at 471 (emphasis added). The Supreme Court in *Hill* therefore held that the conceded violation of the right of allocution protected by Rule 32(a) was not cognizable in a section 2255 *habeas* action because, in such a *habeas* proceeding, relief was generally limited to challenging "a sentence [that] was imposed in violation of the Constitution or laws of the United States." *Id.* at 426, 82 S.Ct. at 470 (quoting 28 U.S.C. § 2255). *Accord Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).

Petitioner Green insists that the facts of *Hill* are distinguishable from the case *sub judice,* and that *Hill* therefore does not foreclose his allocution claim. To be sure, and as the Supreme Court itself recognized in *Hill,* the trial court in that case denied the defendant's right to allocute only in the sense that it did not inform him of his personal right of allocution and the defendant ultimately did not allocute; the court did not deny an affirmative request for allocution by the defendant. *Id.* at 429, 82 S.Ct. at 471–72. Thus, petitioner is unquestionably correct that the Supreme Court has not specifically foreclosed his argument that he has a due process right to allocute once he effectively communicates his desire to do so. Indeed, as the Supreme Court emphasized in the later landmark case of *McGautha v. California,* the Court has never decided whether it violates due process to turn down a defendant's affirmative request for allocution. 402 U.S. 183, 219 n. 22, 91 S.Ct. 1454, 1473 n. 22, 28 L.Ed.2d 711 (1971). Green therefore insists that *Hill* does not foreclose his claim, and that because the Supreme Court has "never *disavowed*" that precise due process claim, Reply Br. at 24 (emphasis added), he is entitled to *habeas* relief.

That a particular claim is open to question, has been specifically reserved, or has never

been "disavowed" by the Supreme Court does not, however, establish that the lower court's rejection of that claim was either "contrary to" or an "unreasonable application of" "clearly established Federal law[ ] as determined by the Supreme Court." Although Green would have us award *habeas* relief upon the basis of any federal claim that the Supreme Court has not specifically "disavowed," such an interpretation would transform *habeas* review under amended 2254(d)(1) into a one-way ratchet whereby a state court must resolve all open questions of federal law in the defendant's favor in order to prevent the conviction or sentence from being vacated on *habeas* review. Rather, as we discussed *supra*, petitioner is entitled to *habeas* relief only if he can demonstrate that the state court's rejection of his allocution claim was at odds with directly controlling Supreme Court precedent, or else applied Supreme Court precedent in a patently unreasonable way.

It follows from this interpretation of section 2254 that the North Carolina Supreme Court's decision rejecting Green's allocution claim was not "contrary to" clearly established Supreme Court caselaw. Not only is there no Supreme Court case holding that someone in Green's position has been denied a constitutional due process right to allocution, but the Supreme Court on more than one occasion has specifically mentioned that the merit of such a claim is an open question. *Hill,* 368 U.S. at 429, 82 S.Ct. at 471–72; *McGautha,* 402 U.S. at 219 n. 22, 91 S.Ct. at 1473 n. 22. Furthermore, none of the other Supreme Court decisions cited by petitioner clearly establishes the existence of such a due process right of allocution. *See Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (invalidating summary contempt conviction of attorney on due process grounds in a case where contempt was adjudicated and punishment imposed after the close of court proceedings and contemnor was not afforded notice or an opportunity to respond to contempt charges); *Groppi v. Leslie,* 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972) (holding state legislature had imposed the punishment of legislative contempt in violation of due process because it failed to provide contemnor with notice or an opportu-

nity to respond); *Schwab v. Berggren,* 143 U.S. 442, 12 S.Ct. 525, 36 L.Ed. 218 (1892) (common law practice of allocution not applicable in appellate court); *Ball v. United States,* 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377 (1891) (holding that order that defendant be executed by hanging was not an appealable final judgment triggering time limit for filing appeal, in part, because it did not appear that at the time of entry of order the defendant was asked why sentence should not be pronounced against him). Green therefore cannot point to any decisions of the Supreme Court to which the state court's adjudication of his allocution claim was "contrary."

Nor did the North Carolina Supreme Court unreasonably apply any clearly established Supreme Court caselaw in rejecting Green's allocution claim. *Although petitioner has cited us to dicta in opinions from the Court discussing the common law practice of allocution, he has not directed us to any Supreme Court decision holding that there is a constitutional foundation, under any circumstances, to that common law right. And, in fact, many lower courts have read this same body of Supreme Court precedents not to create any constitutional right to allocution.* See *United States v. Li,* 115 F.3d 125 (2d Cir.1997) (no constitutional right to allocution even when affirmative request for allocution is denied); *United States v. Fleming,* 849 F.2d 568 (11th Cir.1988) (same); *Martin v. United States,* 309 F.2d 81 (10th Cir.1962) (same); *United States v. Coffey,* 871 F.2d 39 (6th Cir.1989) (holding allocution not required prior to resentencing defendant for probation revocation because no due process right to allocution exists); *United States v. Prince,* 868 F.2d 1379 (5th Cir.1989) (no constitutional right to allocution); *United States v. De La Paz,* 698 F.2d 695 (5th Cir.1983) (same); *Harris v. State,* 306 Md. 344, 357, 509 A.2d 120 (1986) (vacating sentence based on state common law right of allocution but holding "allocution is not a fundamental right secured by either the federal or state constitution" even when affirmative request for allocution is denied); *State v. Carr,* 172 Conn. 458, 374 A.2d 1107 (1977) (no deprivation of due process for state to deny

defendant's affirmative request for allocution); *see also State v. Chow*, 77 Hawai'i 241, 247, 883 P.2d 663 (1994) (reading *Hill* to foreclose any federal due process right not to be denied an affirmative request for allocution); *cf. Freeman v. State*, 876 P.2d 283 (Ct.Crim.App.Okl.1994) (holding no federal due process right of criminal defendant not to be denied an affirmative request for allocution). Indeed, it appears as if only about half of the states provide by statute or other rule for any allocution right, and "[i]n states where the right is not codified, 'the tendency is to regard the practice as a technical formality of little importance in modern criminal procedure, where other procedural devices afford the accused ample opportunity to protect himself at all stages of the proceedings.'" *In re Shannon B*, 22 Cal.App.4th 1235, 1240, 27 Cal.Rptr.2d 800 (1994) (quoting 96 A.L.R.2d 1292, at 1295). We are reluctant to conclude that all of these lower courts and states have applied Supreme Court authority unreasonably, and we conclude that, at the very least, it was reasonable for the North Carolina Supreme Court to read extant Supreme Court caselaw not to clearly establish a federal constitutional right to allocution based upon the common law practice of the same.

Even assuming *arguendo* that the traditional common law practice of allocution has risen to the level of a constitutional entitlement, the North Carolina Supreme Court was nevertheless reasonable in concluding that common law history does not create a constitutional right to allocution in the quite different modern context where a criminal defendant receives other sufficient procedural rights and protections to cure any potential constitutional defect of being deprived of a formal allocution. At English common law, in capital cases, the practice of allocution required the judge to inquire of the defendant if he had any reason why sentence should not be imposed upon him. *See State v. Green*, 336 N.C. at 191, 443 S.E.2d 14 (noting defendant's common law right to be asked formally whether he had "anything to offer why judgment should not be given

against him" (quoting *Anonymous*, 87 Eng. Rep. 175 (1689))). At that time, however, capital defendants had no right to counsel nor could they testify in their own behalf. *In re Shannon B*, 22 Cal.App.4th at 1240, 27 Cal.Rptr.2d 800. Allocution therefore afforded a convicted defendant with his only opportunity to address the court. *Id.* The North Carolina Supreme Court could have reasonably concluded, as have many other lower courts, that modern procedural protections, including the right to counsel and to testify on one's own behalf, accomplish the same or similar objectives of the practice of allocution by allowing a defendant to lodge legal objections to the proceedings and to present his own version of the facts. *State v. Carr*, 172 Conn. 458, 476, 374 A.2d 1107 (1977) (purposes of allocution satisfied where defendant "was represented by experienced counsel throughout the proceedings who was apparently quite thorough in advancing arguments for the defendant at the time of sentencing"); *Robalewski v. Superior Court*, 97 R.I. 357, 359, 197 A.2d 751 (1964) (adhering to precedent upholding the common law practice of allocution notwithstanding "what we consider to be the better view [that] the reason for the inquiry fell once the accused was given the right to counsel"); *Warner v. State*, 56 N.J.L. 686, 695, 29 A. 505 (1894) ("Under the condition of affairs existing in this state, however, the reason for the form has entirely disappeared. The defendant is represented by counsel who needs no invitation to interpose any legal objection at any stage of the proceedings."); *People v. Gaines*, 88 Ill.2d 342, 58 Ill.Dec. 795, 430 N.E.2d 1046 (1981) (in some American jurisdictions the practice of allocution is regarded as "having no more than a ceremonial character because of the safeguards which modern criminal procedure now provides to the defendant"). The North Carolina courts therefore could have reasonably concluded that any constitutional rationale for a right to allocution based upon the common law tradition is absent in a case such as this where other protections would dramatically reduce, if not eliminate altogether, the significance of allocution.[3]

---

3. Not only does Green's historical argument prove too little to establish a constitutional right

to allocution, it also proves too much. At common law, the right to allocution entailed the

The Supreme Court cases relied upon by Green do not "clearly establish" any constitutional right of the kind that Green asserts. Because reasonable jurists could disagree on whether there is any due process right to allocution, we conclude that the decision of the Supreme Court of North Carolina was not objectively unreasonable and not in violation of "clearly established" federal law as determined by the Supreme Court. *Cf. Hogan v. Carter*, 85 F.3d 1113 (4th Cir.1996).

### B.

Green places great weight upon *Ashe v. North Carolina*, a decision from this circuit holding that "when a defendant effectively communicates his desire to the trial judge to speak prior to the imposition of sentence, it is a denial of due process not to grant the defendant's request." 586 F.2d 334, 336 (4th Cir.1978). *See also Boardman v. Estelle*, 957 F.2d 1523 (9th Cir.1992). *Ashe*, however, was decided by us—not by the Supreme Court—and it therefore does not demonstrate that the North Carolina Supreme Court's decision in *Green* was at odds with "clearly established Federal law[ ] *as determined by the Supreme Court*," per the requirement of 28 U.S.C. § 2254(d)(1) (emphasis added). *Ashe* is also not an opinion which simply makes explicit a proposition of law that was implicit but nonetheless clearly established in previous Supreme Court caselaw. Rather, the *Ashe* decision was a significant expansion on previous Supreme Court precedents, and reasonable jurists clearly could debate the propriety of that expansion, as evidenced by the dissent in the Ninth Circuit's decision in *Boardman*, *see* 957 F.2d at 1530–34 (Hall, J., dissenting), and confirmed beyond any doubt by the other state and federal courts which, when confronted with the very same or similar questions, concluded that no due process violation is worked by a trial court's denial of an affirmative request for allocution. *See United States v. Li*, 115 F.3d 125 (2d Cir.1997) (not-

ing that affirmative denial of allocution does not violate federal Due Process Clause); *State v. Chow*, 77 Hawai'i 241, 883 P.2d 663 (1994) (holding that denial of affirmative request for allocution does not violate federal Due Process Clause); *Freeman v. State*, 876 P.2d 283 (1994) (similar); *State v. Stephenson*, 878 S.W.2d 530 (1994) (similar); *Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986) (similar); *In re Shannon B*, 22 Cal.App.4th 1235, 27 Cal.Rptr.2d 800 (1994) (denial of affirmative request for allocution does not violate state right of allocution where defendant was afforded other opportunity to testify before the court); *People v. Robbins*, 45 Cal.3d 867, 248 Cal.Rptr. 172, 755 P.2d 355 (1988) (similar); *People v. Childress*, 158 Ill.2d 275, 198 Ill.Dec. 794, 633 N.E.2d 635 (1994) (similar); *State v. Carr*, 172 Conn. 458, 374 A.2d 1107 (1977) (denial of affirmative request for allocution not violative of either state law or federal due process). Therefore, even if Green could demonstrate that the North Carolina Supreme Court's decision in his case were inconsistent with *Ashe*, he would not be entitled to *habeas* relief on that basis alone.

Finally, even if we believed (counterfactually) that amended section 2254(d)(1) permitted us to award *habeas* relief based upon an inconsistency between our own precedents and the state court's decision, we would nevertheless have to conclude that North Carolina's decision in *Green* was neither contrary to nor an unreasonable application of the principles of law that were clearly established by *Ashe*. In *Ashe*, the defendant was sentenced in front of a judge and was apparently given no opportunity to address the judge during sentencing. In contrast, Green had a sentencing hearing before a jury, and at those sentencing proceedings, Green had a legal right to take the stand and explain his side of the story or plead for mercy. *See Green*, 336 N.C. at 193, 443 S.E.2d 14; N.C.G.S. § 15A–2000(a)(4). North Carolina quite reasonably concluded that, at common

defendant's right to be *asked* by the court whether he had any reason why sentence should not be imposed. *See Green*, 336 N.C. at 191, 443 S.E.2d 14; *see also Ball*, 140 U.S. at 129–30, 11 S.Ct. at 765–66. However, Green has already conceded, as he must under *Hill*, that a criminal defendant

has no constitutional right to be asked whether he wishes to allocute. 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417. Accordingly, Green's argument that the Due Process Clause constitutionalizes the common law practice of allocution cannot be reconciled with Supreme Court precedent.

law, the right to allocution took on added significance for a criminal defendant who was not otherwise permitted to testify on his own behalf, *see also McGautha,* 402 U.S. at 217 & n. 20, 91 S.Ct. at 1472 & n. 20 (at common law, the right to allocution "arose in a context very different" from modern criminal procedure in that at common law "the accused was not permitted to have the assistance of counsel, was not permitted to testify in his own behalf, [and] was not entitled to put on evidence in his behalf"), and that today the need for this right is considerably reduced, if not nonexistent, in the context of a sentencing proceeding where the defendant is free to testify about that which he wishes to offer by way of allocution. Or, as the North Carolina Supreme Court emphasized in *Green,*

> ... [T]he sentencing proceeding in a capital case is unlike any stage in noncapital cases. The defendant in a capital case may testify as to what penalty he feels is appropriate. He is allowed to present evidence as well as take the stand and testify before the jury that will recommend his sentence. Given this, we fail to see the need, much less a constitutional requirement, for a corresponding right of a defendant to make unsworn factual assertions to the jury during a capital sentencing proceeding without being subject to cross-examination.

*State v. Green,* 336 N.C. at 193, 443 S.E.2d 14.

The reasonableness of North Carolina's interpretation of *Ashe* is further confirmed by our language in *Ashe* itself, where we observed that the right of allocution is not unlimited, and that a criminal defendant "need not be heard on ... repetitions." *Ashe,* 586 F.2d at 337. It would have been reasonable for the North Carolina Supreme Court to have read the *Ashe* opinion and concluded that such a right of allocution would be "repetitive" within the meaning of *Ashe* in a context such as this, where the criminal defendant was always free to take the stand and plead for the jury's mercy.

Finally, the reasonableness of North Carolina's interpretation of *Ashe* is further underscored by the many other lower courts which, when confronted with precisely this question, have concluded that a criminal defendant has no due process right to use allocution to circumvent the traditional rules of evidence and make unsworn statements to the sentencing jury without being subject to cross examination. *In re Shannon B,* 22 Cal.App.4th at 1248, 27 Cal.Rptr.2d 800 (holding that "because juveniles are authorized by statute and court rule to testify at their dispositional hearings and address the judge on the question of disposition, the essentials of due process and fair treatment do not require a further right to allocution ..." (internal quotation marks and citations omitted)); *Robbins,* 45 Cal.3d 867, 889, 248 Cal. Rptr. 172, 755 P.2d 355 (1988) ("Assuming *Ashe* is correct in its federal due process analysis, that case is distinguishable" because it arose in a context where the defendant did "not generally have an opportunity to testify as to what penalty he feels is appropriate" whereas "[t]he sentencing phase of a capital trial ... specifically provides for such testimony. The defendant is allowed to present evidence as well as take the stand and address the sentencer. Given this, we fail to see the need, much less a constitutional requirement, for a corresponding right to address the sentencer without being subject to cross-examination in capital cases." (internal quotation marks and citations omitted)); *State v. Nicolaus,* 54 Cal.3d 551, 286 Cal. Rptr. 628, 817 P.2d 893 (1991) (same); *State v. Clark,* 5 Cal.4th 950, 22 Cal.Rptr.2d 689, 857 P.2d 1099 (1993) (same); *People v. Childress,* 158 Ill.2d 275, 198 Ill.Dec. 794, 633 N.E.2d 635 (1994) (same); *State v. Stephenson,* 878 S.W.2d 530 (Tenn.1994) ("capital defendant does not have a federal or state constitutional right to make an unsworn statement to a jury in the sentencing phase of a capital trial"); *Bassett v. Commonwealth,* 222 Va. 844, 284 S.E.2d 844 (Va.1981) (similar); *State v. Whitfield,* 837 S.W.2d 503 (1992) ("the right of allocution in Missouri does not extend to addressing the jury"); *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989) ("We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from the testing for truthfulness and reliability that is accomplished by

cross-examination."). Given the relatively large number of courts that have read the principle of *Ashe* to be inapplicable in a case such as this, where the criminal defendant was free to testify and present witnesses at his sentencing proceeding, we cannot conclude that the North Carolina Supreme Court's decision in *Green* was either contrary to or an unreasonable application of *Ashe*.

## IV.

### A.

■ Green next contends that his sentencing judge unconstitutionally coerced his second capital sentencing jury into entering a death sentence by pressuring holdout jurors into voting in favor of the death penalty in violation of *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield*, the Supreme Court rejected a claim that a trial judge's supplemental instructions or comments to the capital sentencing jury unconstitutionally coerced the jurors into entering a death sentence in violation of the Eighth and Fourteenth Amendments.

Here, the jury began deliberations at 4:30 p.m. and was excused for the evening at 5:30 p.m. They reconvened at 9:26 a.m. the following morning and deliberated until 11:41 a.m. At that time, the court called the jury into the courtroom in order to respond to a note written by the foreman, Ms. Ross, which read, "[w]e have a juror that does *NOT* believe in Capitol [sic] punishment—The questions asked in jury selection were *not* understood. She can't think of *any* reason for the death penalty. Jan Ross." J.A. 176 (emphasis in original). In open court, the judge then asked, without reading the contents of the note aloud in the jury's presence,

Q: Miss Ross, did you write this note and send it into the courtroom?

A: Yes, sir.

Q: All I can tell you is that the information reported in this note is a matter that cannot now be addressed, and you must continue your deliberations with a view to reaching an agreement, if you can, without violence to individual judgment. You can

retire and continue your deliberations. All right. You can go back out.

J.A. at 190 (emphasis added). The jury then began deliberating at 11:45 a.m, J.A. at 190, took a lunch break at 12:55 p.m., J.A. at 191, and reconvened for deliberations at 2:04 p.m., J.A. at 192. At 2:34 p.m., the judge received another note from the jury asking "[d]oes decision [sic] have to be unanimous on both recommendations?" J.A. at 177. The judge brought the jury in and said:

Ladies and gentlemen of the jury, the Court instructed you that for you to recommend that the defendant be sentenced to death in either or both of these cases, the State must prove three things beyond a reasonable doubt: First, that one or more aggravating circumstances existed; Second, that the mitigating circumstances are insufficient to outweigh any aggravating circumstances you have found; and Third, that any aggravating circumstances you have found are sufficiently substantial to call for the imposition of the death penalty when considered with any mitigating circumstances.

If you unanimously find all three of these things beyond a reasonable doubt, it would be your duty to recommend that the defendant be sentenced to death. If you do not so find, or if you have a reasonable doubt as to one or more of these things, in either or both of these cases, it would be your duty to recommend that the defendant be sentenced to life imprisonment.

I hope that answers your question—"Does your decision have to be unanimous on both recommendations?" All right. You may retire and continue your deliberations.

J.A. at 193. The jury continued deliberating at 2:38 p.m., and then, apparently *sua sponte,* the court called the jury out at 3:00 p.m. and the following colloquy took place:

Q: ... Miss Ross, if you'll answer this question either yes or no. Has the jury arrived at a recommendation in either of the cases? That requires a yes or no. A unanimous recommendation in either of the cases, yes or no?

A: Unanimous in either, no, sir.

Q: Well, let me address the question that you gave me a few minutes ago a little bit further. The Court instructed you yesterday that you are required to consider each case separately in your making separate recommendations in each case. I told you that you could recommend—you could recommend death in both cases, or you could recommend death in one case and life imprisonment in the other, or that you could recommend life imprisonment in both cases, but whatever recommendation you make, must be unanimous. All right, you may retire and continue your deliberations.

J.A. at 193–94. The jury continued deliberations and, at 3:23 p.m., the jury gave the court a note reading "[w]e're unable to reach a unanimous decision on either case." J.A. at 177. The judge then brought out the jury one last time and admonished,

Ladies and gentlemen of the jury, let me say this to you. All of us have a considerable amount of time in this case. I know that you have been diligent in your deliberations.

As I told you yesterday, it is your duty to decide from the evidence what the facts are, and you must then follow the law which I gave you concerning punishment as to those facts. This is important, because justice requires that everyone who is sentenced for first degree murder has the sentence recommendation determined in the same manner and have the same law applied to him.

It is your duty to reason the matters over together as reasonable men and woman, to listen to one another's viewpoints and to deliberate with a view to reaching an agreement without violence to individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, each of you should not hesitate to reexamine your own views and change your opinion if it is erroneous. *I caution each of you not to surrender your honest convictions as to the weight or effect of the evidence, or do violence to your conscience, or compromise to your convictions solely because of the opinions of your fellow jurors, or for the mere purpose of making a recommendation.* I'm going to ask you to continue on with your deliberations and see if you can arrive at a recommendation.

J.A. at 197 (emphasis added). (This admonition constituted North Carolina's version of the charge authorized by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).) At 3:25 p.m., the jury recommenced deliberations, and, at 4:26 p.m., returned with death sentences on both counts of first-degree murder. J.A. at 197–98.

The North Carolina Supreme Court, viewing these exchanges between the jurors and the court under the "totality of circumstances," 336 N.C. at 176, 443 S.E.2d 14, determined that the capital sentencing jury was not unconstitutionally coerced into imposing a death sentence. Because the North Carolina Supreme Court's decision was not an unreasonable application of the relevant Supreme Court authority, specifically the *Lowenfield* decision, we conclude that petitioner is not entitled to federal *habeas corpus* relief based upon this claim.[4]

---

4. Although the North Carolina Supreme Court in *Green* held that the jury instructions and colloquy at issue here did not violate Green's "due process rights," 336 N.C. at 175, 443 S.E.2d 14, the state court opinion did not (with respect to the claim of coercion) cite to any federal precedents (such as the *Lowenfield* case that is now relied upon heavily by petitioner), nor did it specifically mention the Due Process Clause of the United States Constitution. *See* U.S. Const. Amd. XIV § 1. It is therefore somewhat unclear whether Green's federal claim under *Lowenfield* was presented to and adjudicated by the North Carolina Supreme Court. Ultimately, however, we conclude that the state court did adjudicate the merits of this claim because it apparently applied *Lowenfield's*

"totality of the circumstances test," 484 U.S. at 237, 108 S.Ct. at 550–51, and also because the state court relied upon its own precedents which, in turn, cited to and relied upon federal precedents falling within the *Lowenfield* line of cases. *Compare Green,* 336 N.C. at 176, 443 S.E.2d 14 (citing and relying upon *State v. Fowler,* 312 N.C. 304, 322 S.E.2d 389 (1984)) *and State v. Fowler,* 312 N.C. 304, 322 S.E.2d 389 (1984) (citing and relying upon *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) and *Jenkins v. United States,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)) *with Lowenfield,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (citing and relying upon *Allen v. United States,* 164 U.S. 492,

The North Carolina Supreme Court methodically and thoughtfully rejected Green's claims of coercion in a manner that was neither contrary to nor an unreasonable application of clearly established law as determined by *Lowenfield.* *Green,* 336 N.C. at 175–81, 443 S.E.2d 14. In the very fact-specific *Lowenfield* opinion, the judge charged the sentencing jury, and instructed it "to consider the views of others with the objective of reaching a verdict, but not [to] surrender their own honest beliefs in doing so." 484 U.S. at 234, 108 S.Ct. at 549. The judge also instructed the jury that failure to reach a unanimous verdict would result in a life sentence. After a short period of deliberation, the foreman sent a note to the judge indicating that the jury was unable to reach a decision. The judge called the jury in and asked each juror to answer, on paper, whether it believed that future deliberations would be helpful. Eight jurors voted "yes," while four jurors voted "no." *Id.* The court directed the jury to continue deliberations. Later; jurors submitted a second note seeking clarification of the judge's previous instruction. The judge rephrased his question slightly, and eleven jurors answered "yes" and one juror answered "no." The judge then gave the jury a supplemental charge, which included statements such as "if the jury is unable to unanimously agree on a recommendation the Court shall impose the sentence of life imprisonment," "it is your duty to consult with one another to consider each other's views and to discuss the evidence with the objective of reaching a just verdict if you can do so without violence to that individual judgment," "[d]o not hesitate to reexamine your own views and to change your opinion if you are convinced you are wrong but do not surrender your honest belief as to the weight and effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict." *Id.* at 235, 108 S.Ct. at 549. The jury resumed deliberations and within thirty minutes returned a death sentence. The Supreme Court held

that, viewing the judge's supplemental statements in "context and under all the circumstances," *id.* at 237, 108 S.Ct. at 550, the verdict was not coerced in violation of the Constitution.

The jury charge and instructions at issue here are well within the range permitted under *Lowenfield.* Most importantly, the judge in this case instructed the sentencing jurors not to abandon their individual judgments, and he did so even more frequently and more forcefully than did the sentencing judge in *Lowenfield.* *See, e.g.,* J.A. at 190 (decide "without violence to individual judgment"); J.A. at 197 ("[e]ach of you must decide the case for yourself"); J.A. at 197 ("I caution each of you not to surrender your honest convictions" or "compromise your convictions solely because of the opinions of your fellow jurors"). Also, the sentencing judge in *Lowenfield,* during his final exchange with the jury, made the almost identical statement to the jurors ("do not hesitate to reexamine your own views") that petitioner Green here contends coerced the "holdout" juror into voting in favor of death. Furthermore, in *Lowenfield,* the jury deliberated for a mere thirty minutes after the judge's final instruction (the so-called *Allen* charge), whereas here, the jury deliberated for a full hour after the judge's final instruction, implying even less coercive effect of the judge's instructions than in *Lowenfield.* *See also United States v. Martin,* 756 F.2d 323, 327 (4th Cir.1985) (en banc) (fact that jury returned verdict two hours after contested jury charge further confirmed lack of any coercive effect to the charge).

Relatedly, the total amount of time of jury deliberations in this case was approximately six hours, which is a small enough period of time to dispel any inference that any potential holdout jurors were "coerced" into voting in favor of the death penalty simply to end a grueling marathon session of jury duty. For example, in *Lowenfield,* in his opinion for the

17 S.Ct. 154, 41 L.Ed. 528 (1896) and *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)). Therefore, it appears as if the state court adjudicated the merits of Green's *Lowenfield* claim, and we accordingly review the state court's determination under amended sec-

tion 2254(d). Of course, to the extent that this claim was not raised and adjudicated in state court, we reject the claim because Green did not exhaust state court procedures. *See* 28 U.S.C. § 2254(b)(1)(A) & § 2254(b)(2); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir.1998).

Court, Chief Justice Rehnquist wrote that "[s]urely if the jury had returned from its deliberations after *only one hour* and informed the court that it had failed to achieve unanimity on the first ballot, the court would incontestably have had the authority to insist that they deliberate further." *Id.* at 238, 108 S.Ct. at 551 (emphasis added). In this case, the sentencing judge required the jury to deliberate for only approximately six hours over the course of two days, and much of that time was interrupted by breaks and recesses. We would be most reluctant to say that an experienced trial judge would be "coercing" a jury into voting in favor of the death penalty simply by requiring it to deliberate, in a capital case, for a mere six hours. *See United States v. Martin,* 756 F.2d 323, 327 (4th Cir.1985) (en banc) (rejecting similar claim in a case where jury had deliberated for approximately eight hours prior to judge's challenged supplemental charge).

We are also unpersuaded by petitioner's frivolous contention that the "coercion" of the sentencing instructions was further compounded by the judge's threats of "personal punishment" that might ensue if the jurors did not vote the in favor of the death penalty. These so-called "threats" occurred at some unidentified time during the sentencing proceedings when the judge instructed the jury "[i]t's your further duty not to read, watch or listen to any accounts of this trial. If you violate these instructions, it could result in personal punishment!" J.A. at 504. Petitioner contends that this earlier admonition, in conjunction with the judge's other instructions regarding the importance of reaching a verdict, would have made the lone holdout juror or jurors feel that they would be subject to punishment if they continued to vote their conscience on the ultimate issue in the capital sentencing proceedings. Obviously, the North Carolina Supreme Court quite reasonably concluded that this warning did not "coerce" the capital sentencing jury into imposing the death sentence against the will of any potential anti-death penalty holdout juror or jurors. *Green,* 336 N.C. at 181, 443 S.E.2d 14.

Green attempts to distinguish *Lowenfield* on the grounds that in that case the jury was informed of the consequences of a deadlock whereas here the capital sentencing jury was not so instructed, *see also infra* at 55–61, but *Lowenfield* does not hold that a jury *must* be informed of the consequences of a deadlock. Rather, *Lowenfield* simply affirmed a sentence that was imposed by a jury that happened to have been instructed as to the consequences of deadlock. Consequently, a state court would not unreasonably apply *Lowenfield* in concluding that its capital sentencing jury need not be instructed of the consequences of deadlock.

The jury charge and supplemental instructions at issue here also fit comfortably within the Supreme Court precedents relied upon in *Lowenfield* itself, even though those precedents are not relied upon by petitioner Green. Most notably, in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (cited and relied upon in *Lowenfield*), the Supreme Court upheld similarly-worded instructions that were apparently directed at the specific jurors who were voting in the minority, whereas here, as in *Lowenfield,* 484 U.S. at 240, 108 S.Ct. at 552, the judge addressed the entire jury in very impartial terms and simply urged them to reach a consensus. In fact, and as the North Carolina Supreme Court concluded, the trial court here did not even read the first foreman's note aloud to the jury, further ensuring that no holdout juror would have been embarrassed or pressured in open court to switch his vote. *Green,* 336 N.C. at 176, 443 S.E.2d 14. The North Carolina Supreme Court also reasonably concluded that the language of the *Allen* charge given here—in particular the statement "[a]ll of us have a considerable amount of time in this case"—when read in context did not "coerce" the capital sentencing jury. *Green,* 336 N.C. at 180, 443 S.E.2d 14. And finally, the record in this case does not support an inference of judicial intent to "coerce" a verdict in favor of the death penalty through the *Allen* charge; although at the time the judge received the first note, he apparently knew that there was one lone anti-death penalty juror, at the point in time when the judge gave the *Allen* charge to the jury, the judge had no way of knowing whether there was still only one anti-death penalty juror or whether the

anti-death penalty juror had persuaded more of the remaining jurors to vote against the death sentence.

This case is obviously unlike *Jenkins v. United States*, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)—another case relied upon by the Supreme Court in *Lowenfield*—in which the Supreme Court invalidated an instruction to the jury commanding "[y]ou have got to reach a decision in this case." Here, the jury merely inquired as to whether it must be unanimous in order to make a sentencing *recommendation*, which is unquestionably the case under North Carolina law, *see Green*, 336 N.C. at 177, 443 S.E.2d 14 ("[t]he trial court correctly informed the jury that any recommendation they made as to sentencing must be unanimous. *See* N.C.G.S. § 15A-2000(b) (1988)"). As the state courts here found, the jury did not inquire whether it "must in all events deliberate until they could return a unanimous recommendation of life imprisonment or death," *id.* at 179, 443 S.E.2d 14, nor did the trial court instruct the jury that it must do so. In fact, had the jury questioned the court whether the jury was required to reach a unanimous recommendation as to a sentence, the trial court would have been required by state law to instruct the jury that "[your] inability to reach a unanimous verdict should not be [your] concern but should simply be reported to the court." *Green*, 336 N.C. at 177, 443 S.E.2d 14 (quoting *State v. Smith*, 320 N.C. 404, 422, 358 S.E.2d 329 (1987)).

Furthermore, and unlike the trial court in *Brasfield v. United States*—a decision which was not cited by petitioner Green and which does not even appear to be based upon the federal Constitution—the trial court here did not inquire into the jury's numerical division. 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926).[5]

Therefore, for these reasons, as well as the other reasons articulated by the North Carolina Supreme Court, *Green*, 336 N.C. at 176–82, 443 S.E.2d 14, and based on our comparison of the facts of this case to those of *Lowenfield*, the North Carolina Supreme Court could quite reasonably conclude that the judge's instructions did not unconstitutionally coerce the jury into imposing the death penalty.

B.

Green also seems to advance an independent but related argument of coercion based upon *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Under North Carolina law, although any recommendation made by the capital sentencing jury must be unanimous, N.C. Const. art. I § 24; N.C.G.S. § 15A-2000(b); *Green*, 336 N.C. at 178, 443 S.E.2d 14, a sentencing jury's failure to reach a decision within a reasonable period of time automatically results in the imposition of a life sentence. N.C.G.S. § 15A-2000(b). The jury is not, however, instructed of the consequences of such a deadlock, *State v. McCarver*, 341 N.C. 364, 389–90, 462 S.E.2d 25 (1995), and if the jury asks about the consequences of deadlock, the court is required by state law to instruct the jury that "[your] inability to reach a unanimous verdict should not be [your] concern but should simply be reported to the court." *Green*, 336 N.C. at 177, 443 S.E.2d 14 (quoting *State v. Smith*, 320 N.C. 404, 422, 358 S.E.2d 329 (1987)). Green contends that the failure to inform his sentencing jury of the consequences of a deadlock, combined with the instruction that any recommendation must be reached unanimously, coerced the jury into imposing the death penalty against its will in violation of *McKoy*. To the extent that Green in fact presses this argument, it is almost certainly waived,[6] and

---

**5.** Petitioner has not argued before this Court that under *Burton v. United States*, 196 U.S. 283, 307, 25 S.Ct. 243, 250, 49 L.Ed. 482 (1905), the mere fact that the trial court judge had knowledge of the numerical division of the sentencing jury at some point during the proceedings is itself a basis upon which to grant the writ and reverse Green's sentence. We therefore do not consider this argument. *But see* State v. Bussey, 321 N.C.

92, 95–97, 361 S.E.2d 564 (1987); *Green*, 336 N.C. at 176, 443 S.E.2d 14 (citing *Bussey*, 321 N.C. at 96, 361 S.E.2d 564).

**6.** Neither Green's petition for writ of *habeas corpus* filed in the district court, J.A. at 283–383, nor the district court's order denying the writ, J.A. at 386–434, appears to discuss this claim.

it has not been exhausted in state court.[7] In any event, it is without merit.[8]

In *McKoy*, the Supreme Court held that it violated the Eighth Amendment for North Carolina to instruct a capital sentencing jury that it must unanimously find from the evidence the existence of mitigating circumstances. In so holding, the Court reasoned that a jury instruction requiring unanimity in order to find the *existence* of mitigating factors would permit one lone "holdout" juror to prevent the other jurors from *considering* mitigating evidence, and that such a scenario would violate the principle that "a sentencer may not be precluded from giving effect to all mitigating evidence." 494 U.S. at 438, 110 S.Ct. at 1231.

The state court's conclusion that Green's sentencing instructions were not unconstitutionally coercive was not contrary to the *McKoy* case. Petitioner concedes that the verdict sheets in this case were in compliance with the dictates of the *McKoy* holding: "On its face, North Carolina's scheme satisfies the requirements of *McKoy* by allowing each individual juror to consider and give effect to mitigating evidence," Appellant's Br. at 17–18 [9]; "North Carolina has responded [to the *McKoy* decision] by reimposing the unanimity requirement at every stage of jury deliberations *except* the stage at which it was expressly forbidden." Appellant's Br. at 14.

Nor was the state court's conclusion that Green's sentencing instructions were not unconstitutionally coercive an unreasonable application of the *McKoy* case. Green's only argument under *McKoy* is, at best, that he was sentenced under a scheme that was inconsistent with the broader policies underlying *McKoy* because refusing to instruct the jury of the consequences of a deadlock, instructing the jury that whatever verdict it reaches must be unanimous, and requiring any sentence recommendation to be unanimous, will force the jury to deliberate "in the dark," Appellant's Br. at 14, and may coerce anti-death penalty jurors in the minority to back down and, presumably out of hopelessness, adopt the majority's recommendation in favor of death. This argument is so tenuously related to the actual holding in *McKoy* that we could not hold that the state court's decision to affirm Green's death sentence constituted an unreasonable application of the clearly established principles of *McKoy*. In *McKoy*, the Supreme Court expressed concern that, if the jury could only consider mitigating factors that were found unanimously, then one juror could essentially impose the death penalty over the will of the other eleven. For example, all twelve jurors could find the existence of certain aggravating factors, and eleven of the twelve jurors could believe that there was a mitigating circumstance that was sufficient to outweigh the aggravating circumstance, but one lone holdout juror who refused to acknowledge the existence of that mitigating circumstance could force the entire jury to impose a death sentence. *See McKoy*, at 440, 110 S.Ct. at

---

7. Green apparently raised a *McKoy*-related claim in state court which was rejected on the merits by the North Carolina Supreme Court. The claim raised in state court, however, appears to be different from the instant *McKoy* claim. *See* 336 N.C. at 174–75, 443 S.E.2d 14 (rejecting claim that jury instructions were inconsistent with *McKoy* because they instructed jury that it "may" rather than "must" consider found mitigating circumstances). We therefore conclude that Green's instant *McKoy* claim was not exhausted and thus cannot justify issuance of the writ. 28 U.S.C. § 2254(b)(1)(A).

8. 28 U.S.C. § 2254(b)(2) (claim may be rejected on the merits even though not exhausted in state court).

9. The verdict sheets at issue here provided:
*Issue One:* Do you *unanimously* find from the evidence, beyond a reasonable doubt, the exis-

tence of one or more of the following aggravating circumstances? . . .
*Issue Two:* Do you find from the evidence the existence of one or more of the following mitigating circumstances? . . .
*Issue Three:* Do you *unanimously* find beyond a reasonable doubt that the mitigating circumstances or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found? . . .
*Issue Four:* Do you *unanimously* find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?
J.A. at 494–498 (first count of first-degree murder) & 499–503 (second count) (emphasis added).

1232 ("[I]t would be the 'height of arbitrariness to allow or require the imposition of the death penalty' where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence."). Petitioner, however, asks this court to do far more than remedy the type of anomaly invalidated by the Supreme Court in *McKoy;* petitioner asks us to hold either that a jury must be instructed that its failure to reach a unanimous verdict will result in the imposition of a life sentence, or else that the jury cannot be required to be unanimous as to any (non-deadlocked) sentencing recommendation that it does make. The "coercion" identified by petitioner is not that one lone holdout juror in favor of the death penalty may override the will of the other eleven jurors who would have voted against death, but rather, that one lone juror who is opposed to imposing the death penalty will feel "coerced" into going along with the other eleven out of a sense of futility because he believes that unanimity is required and knows it will be difficult or impossible to persuade his fellow jurors to change their votes. Green has not cited us any Supreme Court (or other applicable) precedent clearly establishing that a jury must be instructed as to the consequences of deadlock where state law requires that a deadlocked jury automatically results in life imprisonment. Indeed, a court may reasonably refuse to instruct a capital sentencing jury as to the consequences of deadlock in order to promote jury deliberation. *See Evans v. Thompson,* 881 F.2d 117 (4th Cir.1989) ("No obligation exists for the trial judge to inform the jury of the ultimate result should they fail to reach a verdict."); *United States v. Chandler,* 996 F.2d 1073 (11th Cir.1993) ("We ... hold that the district court is not required to instruct the jury on the consequence of the jury's inability to reach a unanimous verdict."); *McCarver,* 341 N.C. at 389–90, 462 S.E.2d 25 ("[W]e have expressly stated that a jury instruction that a life sentence would be imposed if a jury could not unanimously agree should never be given because it would be tantamount to an open invitation for the jury to avoid its responsibility and to disagree." (internal quotation marks and citation omitted)). Furthermore, to the extent Green contends that the unanimity requirement it-

self is unconstitutional, Green's claim asks us to work a fundamental change in death penalty jurisprudence, and Green has not cited any case even suggesting that jury unanimity on the ultimate issue is unconstitutional. Indeed, as Justice Kennedy wrote in his separate opinion concurring in the judgment in *McKoy,* "[j]ury unanimity, it is true, is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community." 494 U.S. at 452, 110 S.Ct. at 1238. *See also McKoy,* 494 U.S. at 449, 110 S.Ct. at 1236–37 (Blackmun, J., concurring) ("Juries are typically called upon to render unanimous verdicts on the ultimate issues of a given case.").

To the extent that this claim was adjudicated in state court, we hold that adjudication was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. To the extent that the claim was not raised and adjudicated in state court, the claim is not exhausted, and in any event, *habeas* relief on the basis of that claim is not compelled by any precedent existing at the time Green's conviction and sentence became final. *See Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *O'Dell v. Netherland,* —— U.S. ——, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997).

## V.

Petitioner advances two claims as to why he was denied the effective assistance of counsel guaranteed by the Sixth Amendment and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Both of these claims were raised and decided on the merits in state post-conviction relief proceedings, and therefore, under amended section 2254(d)(1), our role is simply to determine whether in either case the state court's refusal to rule in Green's favor constituted an unreasonable application of clearly established Supreme Court caselaw. In order to prevail upon either of his ineffective assistance of counsel claims under *Strickland,* Green must establish, first, that counsel's performance was constitutionally deficient,

and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. 466 U.S. at 669, 104 S.Ct. at 2055–56. We conclude that in neither case did the state court unreasonably apply *Strickland* or any other applicable Supreme Court precedents.

First, Green alleges that his counsel at the guilt-phase failed to investigate adequately the events surrounding his troubled childhood [10] and failed to employ that information to prepare a diminished capacity defense for Green. Green further alleges that, if he had known about his colorable diminished capacity defense, then he would have gone to trial instead of pleading guilty, and would have been acquitted or convicted of a lesser offense. Petitioner thus claims that he was denied the effective assistance of counsel and that he is entitled to an evidentiary hearing. We disagree.

Green has not demonstrated that his counsel's representation fell below an objective standard of reasonableness. In his brief, Green contends that "trial counsel concede that despite the overwhelming available evidence, they *never* considered the defense of diminished capacity," Appellant's Br. at 25 (emphasis added), and, if they had considered and investigated the diminished capacity defense, they would have discovered—as did the (unnamed) psychologist and (unnamed) psychiatrist who evaluated Green at the request of his post-conviction counsel—that Green suffers from impaired memory, stress, substance abuse problems, and a (unnamed) psychiatric disorder. *See* J.A. at 167–68. Even if we were to take all of this legally questionable and speculative evidence at face value, it still would not establish Green's claim.

Although in his brief Green insists that his trial counsel "never considered" the diminished capacity defense, the affidavit upon which he relies (which, incidentally, is the affidavit of his current *habeas* attorney who simply recites hearsay evidence from unnamed attorneys and mental health experts) states

"[i]n an interview with one of Mr. Green's attorneys, counsel admitted to me that he did not *fully* investigate a diminished capacity defense." J.A. at 167 (emphasis added). It therefore appears that trial counsel did investigate the diminished capacity defense, but perhaps not as completely as *habeas* counsel, expectedly, would have preferred, viewing the matter in retrospect. Indeed, and as appellant appears to concede elsewhere, Green's mental capacity was evaluated by two psychiatrists at or around the time of his initial proceedings, J.A. at 272, and both of those psychiatrists concluded that Green is of average intelligence and capable of abstract thinking, without significant impairment of memory, competent to stand trial, and able to appreciate the distinction between right and wrong. J.A. at 211–12. And these mental health diagnoses were confirmed by a third psychiatrist who examined Green for the purposes of his second sentencing proceeding and who similarly concluded that Green was without mental illness or personality disorder and that at the time of his double murder he could appreciate the difference between right and wrong. J.A. at 213. From this evidence, and in light of the "highly deferential," *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, standard for assessing assistance of counsel claims, we cannot conclude that the state court unreasonably applied the first prong of *Strickland* when it concluded that Green's guilt-phase counsel acted within the realm of objectively reasonable professional conduct.

Neither has Green established that any alleged constitutional deficiencies in the performance of his guilt-phase counsel were prejudicial, that is, that there is a "substantial likelihood" that Green would have been acquitted of first degree murder if his guilt-phase counsel had conducted more extensive investigation of the circumstances of his childhood. The above-referenced mental health expert testimony establishes that Green, in all likelihood, did not suffer from any significant mental defect or diminution

---

10. According to an affidavit of one of his attorneys, these aspects of Green's life history include his dependence on alcohol and drugs, the death of Green's half-brother, his parent's marital infi- delities and subsequent divorce, and Green's poverty after being discharged from the military. *See* J.A. at 167.

at the time of his killings, and thus would not likely have prevailed in a "diminished capacity" defense. Furthermore, Green's confession to the police, which was properly obtained and offered into evidence, demonstrates without any question that he was guilty of first-degree felony murder. J.A. at 271. Moreover, at capital sentencing proceedings, Green received the benefit of several mitigating circumstances based on the fact that he pled guilty, see J.A. at 494–503 (mitigating factors included: voluntarily cooperated with law enforcement prior to his arrest, confessed after waiving constitutional rights, cooperated after his arrest, and voluntarily admitted his guilt by entering pleas of guilty to first-degree murder), and the fact that defendant pled guilty eliminated any additional punishment for two of his additional counts of armed robbery (with a resulting total of 80 years of imprisonment), and eliminated from the jury's consideration any additional moral culpability associated with premeditation and deliberation. J.A. at 271. Thus, we cannot conclude that any alleged failure of Green's counsel to investigate or prepare a diminished capacity defense would have prejudiced his defense.

 Second, Green contends that he was denied the effective assistance of counsel at his second death penalty proceeding because his attorneys did not adequately investigate the events surrounding one of his prior violent felony convictions that was used by the state as an aggravating circumstance.[11] Green's prior felony was a court martial for an attempted rape he committed while in the Army. Had his penalty-phase counsel investigated the events surrounding that rape conviction, Green argues, counsel would have discovered significant mitigating evidence. In particular, according to hearsay testimony recited in an affidavit of Green's post-conviction counsel, the victim of Green's attempted rape told Green's counsel during a 1995 interview that Green's attempted rape consisted only in his entering her dorm room, and

subsequently mounting and fondling her without her consent. Apparently, Green did not persist in his advances when the victim resisted. The affidavit also recounts the victim's belief that Green was not a violent person by nature, J.A. at 168, and that she did not "think he could have hurt me." J.A. at 168.

None of this demonstrates that Green's sentencing counsel was constitutionally ineffective. Although counsel should conduct a reasonable investigation into potential defenses, Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client. In particular, we simply cannot say that Green's attorneys were constitutionally required to track down the victim from defendant's ten-year-old rape conviction in order to learn whether that victim regarded defendant as a violent person. Perhaps such an investigation may have assisted their client, but we cannot say that their failure to undertake such efforts rendered their conduct constitutionally deficient under Strickland.

Furthermore, we cannot conclude that counsel's failure to uncover this evidence prejudiced Green. Even assuming that the victim of this prior rape would have been available at the time of Green's second sentencing proceedings, and that she would have testified consistently with her hearsay testimony recited in Green's counsel's affidavit, such testimony would not have negated the fact that attempted rape is a violent felony by definition and as a matter of law, both under the Uniform Code of Military Justice, and under the laws of North Carolina. See United States v. Bell, 25 M.J. 676; State v. Green, 336 N.C. at 167–70, 443 S.E.2d 14. Thus, as the North Carolina Supreme Court concluded, evidence that Green's prior rape conviction involved "non-violent" underlying facts would not have rendered this one of three aggravating circumstances to have been inapplicable. Moreover, given the large

---

11. This aggravating circumstance was for committing a prior felony involving "violence or the threat of violence." N.C.G.S. § 15A–2000(e)(3). The two other aggravating circumstances found by Green's second capital sentencing jury were: (1) the murders were committed for pecuniary

gain, and (2) the murder were part of a course of conduct in which the defendant engaged and that included the commission by the defendant of another crime of violence against another person. J.A. at 494 & 499.

amount of other mitigating evidence that was introduced to the effect that Green was generally considered non-violent, we are not convinced that the additional evidence from the victim of the prior rape conviction regarding Green's "non-violent nature," particularly when viewed in light of his two confessed brutal killings, would have persuaded the jury not to impose the death penalty.

## VI.

Next, petitioner Green contends that the trial court erred by refusing to instruct the capital sentencing jury as to certain non-statutory mitigating circumstances. In particular, Green was denied a timely request for jury instructions regarding the following non-statutory mitigating circumstances: (1) that Green would continue to adjust well to prison life and become a model prisoner; (2) that Green did not intend to take the life of Sheila Bland or John Edmondson when he entered Young's Cleaners; and (3) that Green did not enter Young's Cleaners with the weapon which was used to take the lives of Sheila Bland and John Edmondson. J.A. at 413. On direct appeal, the North Carolina Supreme Court ruled that, although it may have been error for the trial court not to so instruct Green's death penalty jury,[12] the state had proven that these errors were harmless beyond a reasonable doubt under the direct review standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

We believe that the North Carolina Supreme Court correctly concluded under *Chapman* that the trial court's failure to instruct the sentencing jury as to these non-statutory mitigating factors was harmless under the standard for direct review, and, *a fortiori*, that the trial court's error was harmless under the less exacting standard for federal *habeas* review of state court convictions under *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993).

First, although Green was denied the above-mentioned non-statutory mitigating instruction that he would continue to adjust well to prison life and become a model prisoner, his sentencing jury was instructed that Green was an "above average inmate and good worker while incarcerated at Fort Levenworth" and that he "has been a model prisoner and adjusted well while incarcerated for these offenses." *Green,* 336 N.C. at 183, 443 S.E.2d 14. The jurors rejected both of these mitigating circumstances, and as the North Carolina Supreme Court held,

> All of the evidence tending to support the requested nonstatutory mitigating circumstances which was not submitted—that the defendant 'will continue to adjust well to prison life and be a model prisoner'—was considered by the jury under those submitted but rejected mitigating circumstances as well as under the catch-all mitigating circumstances.... At least two of the circumstances provided a vehicle for the jury to consider defendant's ability to adjust well to prison life in the future.

*Id.* at 183, 443 S.E.2d 14. We agree with the North Carolina Supreme Court and conclude that, at a minimum, Green has not demonstrated that the trial court's error in refusing to provide him with his rejected model prisoner instruction "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. at 1721–22.

We also believe the trial court's failure to give Green his second and third requested non-statutory mitigating instructions was harmless error. As the North Carolina Supreme Court discussed, the jury was given a general statutory catch-all mitigating instruction. *Green,* 336 N.C. at 185, 443 S.E.2d 14; N.C.G.S. § 15A–2000(f)(9). We believe that this instruction, in combination with the fact that Green's counsel strenuously argued to the jury the underlying facts that Green did not enter Young's Cleaners with the intent to kill or with the murder weapon in hand, in further combination with the fact that the jury found the mitigating circumstance that "the defendant was under the influence of mental or emotional disturbance" at the time he committed the murders, *Green,* 336 N.C. at 185, 443 S.E.2d 14, establish that the trial court did not preclude any juror from consid-

---

12. *But see Buchanan v. Angelone,* —— U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998).

ering and giving effect to any mitigating evidence. Green therefore has not met his burden of establishing that these errors were prejudicial under the *Brecht* standard.

## VII.

█ Petitioner Green, who is black, contends that the prosecutor in his original jury selection unconstitutionally discriminated again black potential jurors in violation of *Batson*, and that the prospect of facing an all-white guilt-phase jury unconstitutionally coerced Green into pleading guilty. Green further contends, on the basis of statistical and anecdotal evidence, that the State of North Carolina, and Pitt County, North Carolina, generally discriminate on the basis of race in seeking the death penalty in violation of principles established in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), and that he is entitled to an evidentiary hearing on this claim. During state post-conviction review proceeding, both of these claims were ruled procedurally barred. J.A. at 269–71.

Green's *Batson* claims were raised in state PCR and the state court held that they were procedurally barred pursuant to N.C.G.S. § 15A–1419(a)(3). That subsection provides that a claim is procedurally barred for the purposes of state post-conviction review if "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C.G.S. § 15A–1419(a)(3). Thus, Green's claims were barred under a state procedural rule that is an adequate and

independent state-law ground, *Ashe v. Styles*, 39 F.3d 80 (4th Cir.1994); *Smith v. Dixon*, 14 F.3d 956, 972 (4th Cir.1994),[13] and the barred claims are therefore also procedurally defaulted for the purposes of federal *habeas* review. Furthermore, Green has not demonstrated the requisite cause and prejudice or a fundamental miscarriage of justice necessary to excuse procedural default.[14] Neither has he established entitlement to an evidentiary hearing on this claim under 28 U.S.C. § 2254(e)(2).

█ Green has also not demonstrated entitlement to *habeas* relief based upon his *McCleskey* claim. The North Carolina Supreme Court properly rejected this claim in *State v. Green*, 329 N.C. 686, 689, 406 S.E.2d 852 (1991)[15]; *see also* J.A. at 269 (state post-conviction review), and the forthcoming statistical study upon which Green wishes to rely does not appear to establish that the state courts' adverse adjudication of this claim was contrary to or an unreasonable application of *McCleskey*. See *McCleskey*, 481 U.S. at 291–319, 107 S.Ct. at 1766–82 (stating very exacting standards for entitlement to constitutional relief based upon statistical evidence of race-of-defendant and race-of-victim effects and rejecting such a claim based upon the Baldus study); *Green*, 329 N.C. at 689, 406 S.E.2d 852 (rejecting Green's *McCleskey* claim based upon two different studies purporting to show race-of-defendant and race-of-victim effects in North Carolina capital sentencing); J.A. 64–91 (Green's unfinished and "very preliminary" Baldus-style study opining the existence of race-of-victim effect in North Carolina's use

---

13. On appeal, Green does not press the argument that this North Carolina procedural rule is not an adequate and independent state ground. *See also* J.A. at 392–95.

14. Indeed, there appears to be little reason for Green not to have pressed these *Batson* claims on appeal to the North Carolina Supreme Court. Although Green raised his *Batson* claims in prior proceedings in state court, it appears as if he never raised such claims before the North Carolina Supreme Court on direct review of his current death sentences. J.A. 269–71. After Green's 1992 resentencing ordered in light of the intervening case of *McKoy*, Green appealed his death sentences to the North Carolina Supreme Court but apparently did not pursue any *Batson* argument there. *See Green*, 336 N.C. 142, 443

S.E.2d 14; J.A. at 395. In fact, Green appears to have consciously abandoned his *Batson* claims because the *Batson* issue was an assignment of error before the North Carolina Supreme Court which Green apparently chose not to brief. J.A. at 395 n. 7; Appellee's Br. at 40 ("the issue was assigned as error in the Record on Appeal to the North Carolina Supreme Court, but was not briefed.").

15. In fact, Green does not challenge the decision of the North Carolina Supreme Court rejecting his *McCleskey* claim. Rather, his only argument here is that a new but yet-unfinished study that was not one of the studies presented to the North Carolina Supreme Court now supports his *McCleskey* claim.

of the death penalty); *see also Green*, 336 N.C. at 194–200, 443 S.E.2d 14 (concluding that Green's death sentences were proportional with other death sentences previously imposed in North Carolina). Nor has Green demonstrated his entitlement to an evidentiary hearing on this claim under 28 U.S.C. § 2254(e)(2).

### CONCLUSION

The judgment of the district court dismissing Green's petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2254 is affirmed.

*AFFIRMED.*

ERVIN, Circuit Judge, concurring separately:

I concur in the result reached by the majority. I am not convinced that much of the discussion in Part II A through C of the majority opinion is either necessary or appropriate given the manner in which the parties addressed and developed those issues.